NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

GOTHAM SHOE MANUFACTURING CO., Inc., Respondent.

No. 121, Docket 29793.

United States Court of Appeals Second Circuit.

Argued Nov. 3, 1965.

Decided Jan. 14, 1966.

Timbers, District Judge, concurred in part and dissented in part.

Harold B. Shore, Atty., National Labor Relations Board (Arnold Ordman, Gen.

Counsel, National Labor Relations Board, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Nancy M. Sherman, Atty., Washington, D. C., on the brief), for petitioner.

Samuel K. Levene, Binghamton, N. Y. (David Levene, Levene, Gouldin & Thompson, Binghamton, N. Y., of counsel), for respondent.

Before KAUFMAN and HAYS, Circuit Judges, and TIMBERS, District Judge.*

HAYS, Circuit Judge:

The National Labor Relations Board seeks enforcement of its order against respondent. The Board's decision and order are reported at 149 NLRB No. 80.

The Board found that respondent had violated Sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (a) (5).[1] The Board ordered respondent to cease and desist from the violations and to take certain affirmative action. We hold that the Board's findings are based upon substantial evidence in the record as a whole, see Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and enforce the order.

Respondent is engaged in the manufacture of shoes and related products. The unfair labor practices took place at its plant in Binghamton, New York.

During the summer of 1963, the United Shoe Workers of America, AFL-CIO, sought to organize respondent's employees. In a letter to respondent dated August 22, 1963, the union claimed that it represented a majority of respondent's employees and requested a meeting for the purpose of collective bargaining. On August 28, respondent wrote to the union stating that it did not believe that the union represented a majority of the employees, and refusing to recognize it as the employees' bargaining agent. The Board found that by August 28 the union had secured designation cards from a majority of employees in an appropriate unit.

On August 29, the union petitioned the Board for a representation election. The election was set for October 15.

The Board found that during the period preceding the date set for the election, respondent, in an attempt to discourage and defeat the union, engaged in a series of violations of Section 8(a) (1) which were designed to undermine the union majority. These activities included:

Threatening employees with reprisals for union activities;

Promising to grant the employees certain benefits if they did not join the union;

Threatening to close or move the plant if the employees joined the union;

Proposing to the employees that they deal directly with the employer;

Leading the employees to believe that the union meetings were held under employer surveillance;

Requesting employees to report what happened at union meetings and who attended them;

Enforcing an illegal no-solicitation rule.

▇ It is unnecessary to go into the evidence that supports the Board's findings of these violations of Section 8(a) (1). It is sufficient to say that that evidence is clearly substantial. While much of the evidence is contradicted by sharply conflicting evidence, the question of credibility is to be answered by the

---

* Chief Judge of the District Court of Connecticut, sitting by designation.

1. (a) "It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
    *   *   *   *   *   *   *
    (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

Trial Examiner and the Board. We see no reason in the present case for quarreling with their answer. See National Labor Relations Board v. Warrensburg Board & Paper Corporation, 340 F.2d 920, 922 (2d Cir. 1965).

On October 14, 1963, the Board, because unfair labor practice charges were about to be filed, postponed the election of representatives which had been scheduled for October 15.

In addition to the finding of violations of Section 8(a) (1), the Board has found that respondent violated Section 8(a) (5) (and consequently Section 8(a) (1) also) by refusing to bargain with the union when requested. With respect to this aspect of the Board's decision, respondent contends (1) that there is insufficient proof of the union's majority status, (2) that the employer had a good faith doubt that the union represented a majority of the employees, and (3) that in any event the order of the Board should not have directed the respondent to bargain with the union.[2]

It is conceded that at the time when the respondent refused to bargain the union had authorization cards from a majority of the employees. This would ordinarily be enough to establish the union's majority status and the employer, absent a good faith doubt, would violate Section 8(a) (5) upon refusal to bargain. National Labor Relations Board v. Philamon Laboratories, Inc., 298 F.2d 176, 179 (2d Cir.), cert. denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L. Ed.2d 498 (1962); National Labor Relations Board v. Sunrise Lumber & Trim Corp., 241 F.2d 620 (2d Cir.), cert. denied, 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34 (1957). However, the respondent contends that the union obtained many cards by representing that they would be used to secure an election. See National Labor Relations Board v. Koehler, 328 F.2d 770 (7th Cir. 1964); cf. Happach v. National Labor Relations Board, 353 F.2d 629 (7th Cir. 1965) (explaining Koehler). It appears that in the case of a few of the cards the union told the employees that the cards would be used *only* for the purpose of securing an election. These cards were not counted by the Board. In soliciting a number of other cards the union stated, not that the cards were sought *solely* for the purpose of securing an election, but that "The cards are for a vote"; or, "Sign the cards so we can have a vote"; or, "You have to have a certain percentage of signed cards in order to have an election." The cards themselves, on the other hand, read:

"I hereby authorize the United Shoe Workers of America, AFL-CIO, to represent me in collective bargaining with my employer."

Moreover, the union representatives explained to the employees that when a majority of cards had been signed, the union would request collective bargaining, but that there might have to be an election anyway.[3] The Board counted the cards in this second group.

■ It seems to us and we hold that the Board had the right under these circumstances to count the cards of the latter employees towards the establishment of a union majority. Happach v. National Labor Relations Board, supra; National Labor Relations Board v. Cumberland Shoe Corporation, 351 F.2d 917 (6th Cir. 1965); see National Labor Relations Board v. Winn-Dixie Stores, Inc., 341 F.2d 750, 754–755 (6th Cir. 1965); cf. Joy Silk Mills, Inc. v. National Labor Relations Board, 87 U.S.App.D.C.

2. The respondent does not appear seriously to raise as a separate question the propriety of the unit. In any event there is no valid basis for objection to the Board's findings on that score.

3. "[T]he way he said it to all of us down there, was if the guys wanted the Union in to sign the cards. He said try to get one hundred per cent signed. * * * Make sure you have 75 or 80%. After you have 75% or 80%, you send a letter to the Company and tell them this is the number of people that want the Union. If the Company agrees, you have your Union in. If they don't, then you have to have an election."

360, 185 F.2d 732, 743 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951).

■ In view of respondent's conduct in seeking, during the whole period from the time of the demand for recognition until the time set for the election, to undermine the union, the Board could properly find that the employer's refusal to bargain was for the purpose of gaining time to destroy the union's majority and that it had no good faith doubt of that majority. See National Labor Relations Board v. Overnite Transportation Company, 308 F.2d 279, 283 (4th Cir. 1962); National Labor Relations Board v. Epstein, 203 F.2d 482 (3d Cir. 1953); Joy Silk Mills, Inc. v. National Labor Relations Board, supra 185 F.2d at 741–742.

The propriety of the Board's order directing respondent to bargain collectively with the union remains to be considered. In National Labor Relations Board v. Flomatic Corporation, 347 F.2d 74 (2d Cir. 1965) this Court held that the proper remedy for a situation bearing some similarities to the situation with which we are faced in the present case, was an election. However, as we later pointed out in Irving Air Chute Co., Inc. v. National Labor Relations Board, 350 F.2d 176, 182 (2d Cir. 1965):

"In [Flomatic], however, there was only a minimal § 8(a) (1) violation and no demand and refusal to bargain. The appropriate remedy must be fashioned to meet the situation presented in each particular case and often depends on factual differences seemingly slight but sufficient to tip the scales in favor of the Board's conclusion. Here an election at this time would be manifestly unfair to the Union since it would allow the Company to reap the benefits of its anti-union acts and undoubtedly would result in additional costs to the Union of a new organizational drive. It would, therefore, be inappropriate for this Court to reverse the Board's decision and order a new election."

■ Since, then, respondent has by its own conduct made the holding of a free election impossible and since the Union's loss of majority support is the result of respondent's "aggressive or planned campaign aimed at dissipating union strength," National Labor Relations Board v. Flomatic Corporation, supra 347 F.2d at 78, the Board must be upheld in its choice of remedy.[4] It is a remedy which has been applied in many cases with the approval of the courts. See, e. g., Franks Bros. Co. v. National Labor Relations Board, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); National Labor Relations Board v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380 (1942); National Labor Relations Board v. Philamon Laboratories, Inc., 298 F.2d 176, 182–183 (2d Cir. 1962); National Labor Relations Board v. Stow Manufacturing Co., 217 F.2d 900, 905 (2d Cir. 1954). And we approve its use once again.

Enforcement granted.

TIMBERS, District Judge (concurring in part and dissenting in part):

I concur in the eminently sound opinion of the majority to the extent that it grants enforcement of the Board's order that respondent cease and desist from certain specified violations of Section 8 (a) (1) and that respondent take certain affirmative action with respect thereto, except that I respectfully dissent from the majority's enforcing the Board's order regarding the alleged no-solicitation rule of respondent. I further respectfully dissent from the majority's enforcing the Board's order that respondent bargain collectively with the Union, based on alleged violations of Section 8(a) (5).

4. "It is for the Board, not the courts to determine how the effect of prior unfair labor practices may be expunged." International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50 (1940).

## SECTION 8(a) (1)

### Violations Other Than No-Solicitation Rule

With the exception of the alleged no-solicitation rule violation, the Board's order, which adopted the trial examiner's recommendations with respect to Section 8(a) (1) violations set forth in paragraphs 1(a) through 1(g) of the trial examiner's recommended order, is based on findings which are supported by substantial evidence on the record considered as a whole and should be enforced. National Labor Relations Act, § 10(e), as amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 160(e) (1958 ed.); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951); see N. L. R. B. v. Brown, 380 U. S. 278, 290, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); American Ship Building Co. v. N. L. R. B., 380 U.S. 300, 335–336, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) (concurring opinion of Justice Goldberg); cf. O'Keeffe v. Smith Associates, 380 U. S. 359, 371–372, 85 S.Ct. 1012, 13 L.Ed. 2d 895 (1965) (dubitante by Justice Douglas). There was sharply conflicting evidence before the trial examiner upon the issue of the Section 8(a) (1) violations; but, as we recently noted in N. L. R. B. v. Warrensburg Board & Paper Corp., 340 F.2d 920, 922 (2 Cir. 1965), "Although there was conflicting testimony on this issue, we have held in the past that questions of credibility are for the trier of fact and that we will not upset the decision of the Board 'when it accepts a finding of an Examiner which is grounded upon (a) his disbelief in an orally testifying witness' testimony because of the witness' demeanor or (b) the Examiner's evaluation of oral testimony as reliable, unless on its face it is hopelessly incredible or flatly contradicts either a so-called "law of nature" or undisputed documentary testimony' (citations omitted)," quoting from N. L. R. B. v. Dinion Coil Co., 201 F.2d 484, 490 (2 Cir. 1952); see Mak-All Mfg., Inc. v. N. L. R. B., 331 F.2d 404, 405 (2 Cir. 1964); N. L. R. B. v. Marcus Trucking Co., 286 F.2d 583, 590 (2 Cir. 1961).

In short, to the extent that the Board adopted recommendations of the trial examiner who heard and evaluated the witnesses and resolved the sharply conflicting evidence, and to the extent that the Board's findings are thus grounded upon substantial evidence on the record considered as a whole, the Board's order should be enforced. I concur in that portion of the majority's decision.

### Alleged No-Solicitation Rule Violation

The Board's finding that respondent "promulgated a broad and presumptively unlawful no-solicitation rule which it discriminatorily applied" is, in my view, quite a different matter. The Board's finding on this issue is squarely contrary to that of the trial examiner who made the following finding:

"I find no evidence to support paragraph 6(g) of the complaint that Respondent instructed employees not to discuss the Union on their own time. I find that employees were admonished not to discuss the Union during working hours, and I find that there was no Company 'rule' on this matter; however, I find that Testani's admonitions to employees not to discuss the Union during working hours did not constitute a violation of the Act, as alleged in paragraph 6(h) of the complaint."

The entire evidence in the record before us on the so-called "no-solicitation rule" may be briefly summarized as follows:

(1) General Counsel's witness Anna Balanda testified that some time between July 1963 and October 15, 1963, plant superintendent Testani called her into the stock room and in the presence of Rose Boezi, a floor lady, told Balanda that "we were not supposed to talk Union *during working hours*, and that if I was caught talking Union *during working hours*, I would be fired, and not even the Labor Board would help me." Balanda also testified that "We were told we were not to talk about the Union *during working hours* * * * we did not talk *during working hours*. We talked before 7

o'clock and the lunch hour." (Emphasis added.)

(2) General Counsel's witness Raymond Heatherman testified that on October 2, 1963, "just before we punched in at noon on our way back from lunch," Testani said to Heatherman and his brother-in-law, Robert Douglas, that "we couldn't talk Union *on Company time*, that the wrong people would catch it and we'd get fired." General Counsel's witness Douglas testified, regarding the same conversation, that "Testani came over and told us not to discuss Union *on Company time* or we could get fired." (Emphasis added.)

(3) General Counsel's witness Clarence Young, a union committeeman, testified that during the latter part of September 1963, in response to Testani's request that employees Ralph Farnham and Nancy Morabito be told to keep quiet, Young told Testani that he would talk to the two employees and tell them not to talk about joining the Union any more except at noon hour or before or after work. Specifically, Young's complete testimony on this issue, and in context, was that "He [Testani] come in there and told me I'd have to tell Ralph Farnham to— He said I'd have to go and have a talk with him and tell him to keep quiet; that everytime he went upstairs he was talking to the ladies about joining the Union and stuff. He wanted it stopped. He said, 'You'll have to go down and have a talk with him.' I said, *'I'll see that he doesn't do it any more unless it's noon hours or before or after work,' that I'd stop him during the other times.* We came out of the men's room. Nancy [Morabito] was working there as we came out; so he pointed to her; he said, 'Here's another one here. Tell her to keep quiet. Her, I can understand. She's a little bit crazy.' He said, 'You tell her and Ralph to keep quiet. They can be fired for that.' I said, 'I'll talk to them right away.' I went and talked to Ralph first and then to Nancy and told them not to do it any more." (Emphasis added.)

In addition to the foregoing, specifically relied upon by the trial examiner in support of his finding that there was no evidence of a company no-solicitation rule, the trial examiner summarized further evidence on this issue as follows: "Several employees testified that they knew of no instructions not to talk about the Union and that they and other employees did freely. Clifford Barton testified on cross examination that *he knew of no rule of any kind posted that restricted employees from talking about a union*; and that the employees talked openly about the Union in the plant. William Osborne testified that *he knew of no formal order issued by the Company restricting discussion of a union* in the plant and that there was a general discussion about it in the plant." (Emphasis added.)

The Balanda testimony and the Heatherman-Douglas testimony unequivocally established that Testani's admonitions were confined to not talking about the union "during working hours" or "on company time." The Young testimony, if not fragmentized and lifted out of context, is equally clear that Young, a union committeeman, understood that Testani's requests to have Farnham and Morabito "keep quiet" referred to periods of time other than "noon hours or before or after work." The trial examiner's finding on this issue was based on his evaluation of the oral testimony of these witnesses as reliable. "Nothing in the statutes suggests that the Labor Board should not be influenced by the examiner's opportunity to observe the witnesses he hears and sees and the Board does not. Nothing suggests that reviewing courts should not give to the examiner's report such probative force as it intrinsically commands." Universal Camera Corp. v. N. L. R. B. supra at 495. Upon this evidence, the trial examiner's finding of the absence of any no-solicitation rule on the part of the company is not only supported by substantial evidence on the record considered as a whole; there simply is no

evidence to the contrary in the entire record.

We have in the instant case, therefore, a situation on this issue sharply distinguishable from that disclosed in those cases in which we have enforced previous orders of the Board finding no-solicitation rules to be in violation of Section 8 (a) (1). N. L. R. B. v. Miller, 341 F.2d 870, 873–874 (2 Cir. 1965) (posted notice construed as rule prohibiting solicitation during nonworking time or distribution of literature in nonworking areas); N. L. R. B. v. Willow Maintenance Corp., 332 F.2d 367, 368 (2 Cir. 1964) (rule prohibiting distribution of union literature in company's waiting room, a non-work area); N. L. R. B. v. United Aircraft Corp., 324 F.2d 128 (2 Cir. 1963) (rule prohibiting distribution of union literature in non-work areas on non-work time); N. L. R. B. v. Clark Bros. Co., 163 F.2d 373, 375 (2 Cir. 1947) (published rule prohibiting union solicitation on company premises during nonworking hours); see N. L. R. B. v. United Steelworkers, 357 U.S. 357, 361–364, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958); N. L. R. B. v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956); Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 803 n. 10, 804–805, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); Jas. H. Matthews & Co. v. N. L. R. B., 354 F.2d 432 (8 Cir. 1965) (rule forbidding "soliciting on Company property without permission" held unlawful if applied to non-working time as well as to working time); N. L. R. B. v. Linda Jo Shoe Co., 307 F.2d 355, 357 (5 Cir. 1963); N. L. R. B. v. Walton Mfg. Co., 289 F.2d 177, 180–181 (5 Cir. 1961).

I have been unable to find any decision which has enforced a Board order based on a finding of a company no-solicitation rule grounded on such insubstantial evidence—more accurately, such a total absence of evidence—as disclosed by the record before us. At most, the evidence here, if it proves any "rule" at all (the trial examiner found that "there was no Company 'rule' on this matter"), establishes precisely the type of rule approved by the Board in Peyton Packing Co., 49 N. L. R. B. 828, 843–844 (1943), enforced, N. L. R. B. v. Peyton Packing Co., 142 F.2d 1009 (5 Cir. 1944), cert. denied, 323 U.S. 730, 65 S.Ct. 66, 89 L. Ed. 585 (1944), quoted with approval in Republic Aviation Corp. v. N. L. R. B., supra at 803 n. 10:

"The Act, of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time. Working time is for work. It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during working hours. Such a rule must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose. * * *"

See N. L. R. B. v. United Aircraft Corp., supra at 130–131.

On the record before us, it seems to me, with deference, that to uphold the Board's overturning the trial examiner's finding that there was no evidence of a company no-solicitation rule and to sustain the Board's contrary finding that the company's conduct in this regard constituted an unfair labor practice within the meaning of Section 8(a) (1) in interfering with, restraining and coercing employees in the exercise of rights guaranteed by Section 7, is to refuse to exercise the authority—where exercise of such authority is called for in the most compelling terms—first specifically directed to our attention by the Supreme Court in Universal Camera Corp. v. N. L. R. B., supra at 488,[1] "Congress has

---

1. It will be recalled that in Universal Camera the Supreme Court vacated our judgment, 179 F.2d 749, 751–754, that we were barred from taking into account the report of the examiner on questions of fact insofar as that report was re-jected by the Board, the Supreme Court holding that "It is therefore difficult to escape the concluson that the plain language of the statutes directs a reviewing court to determine the substantiality of evidence on the record including the ex-

\* \* \* made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view," and as recently reaffirmed by the Supreme Court in unmistakably clear language particularly appropriate to the instant case. In N. L. R. B. v. Brown, supra at 291–292, the Supreme Court on March 29, 1965 said:

"Courts are expressly empowered to enforce, modify or set aside, in whole or in part, the Board's orders, except that the findings of the Board with respect to questions of fact, if supported by substantial evidence on the

aminer's report." 340 U.S. at 493. The Court quoted from the final report of the Attorney General's Committee on Administrative Procedure, p. 51, " \* \* \* on matters which the hearing commissioner, having heard the evidence and seen the witnesses, is best qualified to decide, the agency should be reluctant to disturb his findings unless error is clearly shown." 340 U.S. at 494. On the weight to be given a trial examiner's report in applying the substantial evidence standard, the Court said, "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is 'substantial.'" 340 U.S. at 496–497. And, in remanding the case to our Court, the Supreme Court concluded, "We therefore remand the cause to the Court of Appeals. On reconsideration of the record it should ac-

record considered as a whole, shall be conclusive. National Labor Relations Act, as amended, §§ 10(e), (f), 29 U.S.C. §§ 160(e) (f) (1958 ed.). Courts should be 'slow to overturn an administrative decision,' Labor Board v. Babcock & Wilcox Co., 351 U.S. 105, 112, but they are not left 'to "sheer acceptance" of the Board's conclusions,' Republic Aviation Corp. v. Labor Board, 324 U.S. 793, 803. Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and

cord the findings of the trial examiner the relevance that they reasonably command in answering the comprehensive question whether the evidence supporting the Board's order is substantial. But the court need not limit its reexamination of the case to the effect of that report on its decision. We leave it free to grant or deny enforcement as it thinks the principles expressed in this opinion dictate." 340 U.S. at 497.

Upon remand, we reversed the Board's order (which we had ordered enforced on the earlier appeal) and dismissed the complaint, Judge Learned Hand stating for the Court (190 F.2d 429, 430–431):

"Perhaps as good a way as any to state the change effected by the amendment [1947 amendment to § 10(e) of National Labor Relations Act, 29 U.S.C. § 160(c), making findings of Board conclusive "if supported by substantial evidence on the record considered as a whole"] is to say that we are not to be reluctant to insist that the examiner's findings on veracity must not be overruled without a very substantial preponderance in the testimony as recorded.

\* \* \* \* \* \* \*

" \* \* \* upon a reexamination of the record as a whole, and upon giving weight to the examiner's findings— now in compliance with the Court's directions as we understand them— we think that our first disposition of the appeal was wrong, and we hold that the Board should have dismissed the complaint."

courts would abdicate their responsibility if they did not fully review such administrative decisions. Of course due deference is to be rendered to agency determinations of fact, so long as there is substantial evidence to be found in the record as a whole."

And in American Ship Building Co. v. N. L. R. B., supra at 335–336, Justice Goldberg in his concurring opinion on March 29, 1965 said:

"The sum of all this is that the record does not supply even a scintilla of, let alone any substantial, evidence to support the conclusion of the Board * * * but, rather, this conclusion appears irrational. Cf. Labor Board v. Erie Resistor Corp., 373 U.S. 221, at 236.

* * * * * * *

"The fact that the Board held on the undisputed facts that the employer's fear of a strike was unreasonable and that the Court of Appeals has affirmed the Board does not preclude us from reviewing this determination. See Public Service Comm'n v. United States, 356 U.S. 421. The standard that should have been applied by the Court of Appeals was whether the Board's finding was supported by substantial evidence when the record was viewed as a whole. Universal Camera Corp. v. Labor Board, 340 U.S. 474. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168; Interstate Commerce Comm'n v. J-T Transport Co., 368 U.S. 81, 93. 'The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.'

Universal Camera Corp. v. Labor Board, supra at 490. Indeed, the Board here set aside the report of its trial examiner, and in Universal Camera this Court recognized 'that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion.' 340 U.S., at 496. The Court of Appeals in my view in its summary affirmance on this issue grossly misapplied the standards laid down by Universal Camera. This case is properly before us on a substantial legal question, which necessarily involves a review of the entire record. In making such a review, although we give proper weight to what the first reviewing court decides, we cannot ignore our duty to apply the statutory standard that the Board's findings must be supported by substantial evidence. Since the Board's holding was not so supported, but, on the contrary, as the plain facts of the record reveal, was irrational, I would reverse the Court of Appeals on this ground."

In the instant case, I am not able from my position as lonesome end on this issue to say that the majority, in upholding the Board's finding that the company "promulgated a broad and presumptively unlawful no-solicitation rule which it discriminatorily applied," failed to take into account the trial examiner's finding squarely to the contrary and the total absence of evidence in the record to support the Board's finding. I do note that the majority opinion is silent on the conflict between the Board's finding on the one hand and the trial examiner's finding and the unique state of the record on the other hand.[2]

2. "The Court of Appeals in a single sentence sustained the Board's holding on this point concluding, without detailed analysis, 'that the Board's finding that

respondent had no reasonable basis for fearing a strike is not without the requisite record support.'" American Ship Building Co. v. N. L. R. B. supra

## SECTION 8(a) (5)

The Board's finding, which the majority upholds, that respondent refused to bargain collectively in good faith in violation of Section 8(a) (5), raises the issues of (1) whether the union had a *majority* at the time of its request for recognition and bargaining; (2) whether respondent acted in *good faith* in questioning the union's majority and refusing to bargain; and (3) whether the appropriate *remedy* is an order directing collective bargaining rather than a new election.

Critical to the resolution of each of these issues is whether a majority of respondent's employees in an appropriate unit had authorized the union to represent them as their collective bargaining representative, as reflected by so-called authorization cards, on the date of the union's demand for recognition and bargaining.

Our decision on the validity of the authorization cards relied upon to establish the majority status of the union should be made in the light of the basic purpose of the Act—to promote industrial peace and stability in labor-management relations—particularly here in safeguarding *employees'* rights guaranteed under Section 7, including their rights "to self-organization," "to bargain collectively through representatives of their own choosing" and "to refrain from any or all such activities."

*Majority*

The use of authorization cards in the instant case furnishes a glaring illustration of what the Board and the courts, including our own, have referred to as a "notoriously unreliable method of determining majority status of a union." N. L. R. B. v. Flomatic Corp., 347 F.2d 74, 78 (2 Cir. 1965); Sunbeam Corp., 99 N.L. R.B. 546, 550–551 (1952); Midwest Piping and Supply Co., Inc., 63 N.L.R.B. 1060, 1070 (1945); cf. Peterson Brothers, Inc., 144 N.L.R.B. 679, 682 (1963);

Morris & Associates, Inc., 138 N.L.R.B. 1160, 1164 (1962).

The union in a letter to respondent dated August 22, 1963 claimed that it represented a majority of respondent's employees and requested a meeting. Respondent replied by a letter dated August 28 that it did not believe the union represented a majority of respondent's employees in an appropriate unit for collective bargaining purposes and therefore it could not recognize the union as bargaining agent. The Board and the examiner held that, although the union requested recognition on the basis of its claimed majority on August 22, the critical date for determining majority status was August 27, the day before respondent refused to recognize the union. As of August 27, they found that the total number of employees in the appropriate unit was 101, of which, according to their finding, 52 would constitute a majority.

Of 73 authorization cards signed on or before August 27, the Board and the examiner found that 66 were "valid and timely authorization cards" and therefore "the Union represented a majority of Respondent's employees in an appropriate unit on August 28, 1963." Of the 66 cards accepted as valid and timely, 2 were signed between the date (August 22) the union notified respondent it represented a majority and the date held to be the cut-off date (August 27); 8 were signed "on an undetermined date before August 27" (3 of these were stamped "UNDATED" and the dates on the others were inserted by persons other than the signers, as disclosed by Xerox copies of the original cards which have been furnished to us); 11 were signed by employees who testified they signed the cards without reading them; 3 were signed by employees who could not read; 2 were signed by employees who testified they did not know what the words "represent me in collective bargaining" mean; 3 were signed solely because they saw other employees signing; 1 was

at 328 (concurring opinion of Justice Goldberg) (Supreme Court reversed Court of Appeals which sustained Board's rejection of trial examiner's finding).

signed, not by the employee himself (who could neither read nor write), but by his brother; 1 was signed by an employee who was deaf and dumb but could read, her signature having been obtained in response to a note asking her to "sign Union," after which she returned the card to a union solicitor; and 1 was signed by an employee who died before the hearing (her card and those of 14 others were accepted as valid although they did not appear at the hearing to authenticate them or to explain the circumstances under which they were obtained).

The most controversial group of authorization cards accepted as valid, however, were 18 signed by employees in response to statements by union solicitors, *not* that they were for the purpose of authorizing the union to represent the employees in collective bargaining with the employer, *but* that "The cards are for a vote," or "Sign the cards so we can have a vote," or "You have to have a certain percentage of signed cards in order to have an election," or "Signing of the card was for the purpose of getting an election and was not itself a vote," or "If they could get a majority of the cards signed, they would have the right to a vote for or against the Union for their collective-bargaining representative," or "Just because an employee signed the card, this did not mean that he was joining the Union." It is conceded that if the cards in this group alone were excluded, the union did not have majority status; it would have had but 48 out of 101 in the bargaining unit. Both the Board and the examiner acknowledge that "the distinction between representations that an election is the *sole* purpose of the cards and representations that an election is *a* purpose

may seem a fine one" (emphasis that of the Board); but, according to the Board, *"the distinction goes to the very basis for the rule."* (Emphasis added.)

The Board and examiner here excluded 7 authorization cards signed by employees "after receiving assurances from solicitors that the *sole* purpose of the cards was to obtain a secret election"; with respect to these cards, the examiner found that "It is certainly a false statement to tell an employee that the card is only for the purpose of securing an election" [3]; and the Board, in upholding the examiner, noted that "Where the union misrepresents the purpose of authorization cards to the employees by telling them the cards will be used *only* to obtain a vote for or against the Union by secret ballot, the Board has refused to use such cards as evidence of majority because the signers have not 'clearly manifested an intention to designate the Union as their bargaining representative.' " In determining majority status of a union, such cards—obtained by misrepresentations that their *sole* purpose was to obtain a secret election—have been uniformly excluded by the courts and by the Board. N. L. R. B. v. Koehler, 328 F.2d 770, 773 (7 Cir. 1964); Morris & Associates, Inc., 138 N.L.R.B. 1160, 1164, 1176–1177 (1962); Englewood Lumber Co., 130 N. L.R.B. 394, 395 (1961); see Happach v. N. L. R. B., 353 F.2d 629 (7 Cir.1965); N. L. R. B. v. Cumberland Shoe Corp., 351 F.2d 917, 920 (6 Cir.1965); N. L. R. B. v. H. Rohtstein & Co., 266 F.2d 407, 409–410 (1 Cir. 1959); N. L. R. B. v. James Thompson & Co., 208 F.2d 743, 745–748 (2 Cir. 1953); N. L. R. B. v. Dadourian Export Corp., 138 F.2d 891, 892–893 (2 Cir. 1943).

3. The examiner then posed, and answered in the negative, this question: "Is it trickery or beguilement to tell an employee 'to sign the card so that we could vote,' or to tell an employee that if they could get 31% of the employees to sign, they could have an election, as many employees were told?"

The examiner also noted that "I do not intend to categorize all types of false statements as justifying a challenge to an authorization card. There are some types of false campaign propaganda inducing a signature on an authorization card that would not negate the effectiveness of that act, any more than it would warrant the setting aside of a representative election."

Of late, however, the Board and two courts have recognized an exception to the rule that fraud on the part of union solicitors in misrepresenting the purpose of the cards vitiates the consent to union representation which is the prime function of the cards. Thus, they say that when the fraud consists of stating that an election is the *sole* purpose of the cards, such cards are invalid; but when the fraud consists of stating that an election is *one* purpose, they are valid. Happach v. N. L. R. B., supra; N. L. R. B. v. Cumberland Shoe Corp., supra. Until today's decision of the majority in the instant case, our Court has recognized no such distinction, and I emphatically dissent from the majority holding in this respect.

This issue—the degree of fraud on the part of union solicitors in obtaining union authorization cards which will be condoned—marks this as a case which is "properly before us on a substantial legal question, which necessarily involves a review of the entire record." American Ship Building Co. v. N. L. R. B., supra at 336 (concurring opinion of Justice Goldberg); it is the type of legal issue in which "[e]ven where the Board is sustained, its analysis in support of its conclusion is subjected to full, independent judicial review." N. L. R. B. v. Brown, supra at 291 n. 5. I have carefully examined the entire record in this case. In my opinion, it furnishes a striking demonstration of the utterly irrational basis for the Board's rule distinguishing between fraud in obtaining authorization cards by misrepresenting that an election is the *sole* purpose of the cards and fraud in misrepresenting that an election is *one* purpose of the cards.

Bearing in mind that the alleged majority status of the union concededly turns upon the validity of the 18 authorization cards which the Board found were signed in response to statements by union solicitors that *one* of their purposes was to obtain an election (whereas the Board excluded as invalid those signed on the representation that their *sole* purpose

was to obtain an election), the record discloses the irrational basis for such distinction, particularly in the light of the following evidence with respect to the 18 critical cards:

First, the trial examiner found that "From the testimony of the Union representatives and other witnesses, I find that the Union representatives set out to and were following the 'election route' toward recognition as bargaining representatives from the Respondent."

Second, not a single one of the employees who signed the 18 critical cards was told that the purpose of the cards was to authorize the union to represent them; all were told that the purpose of the cards was to obtain an election or a vote.

Third, the trial examiner found that the two union organizers, McCauley and Babchin, stated at union meetings attended by employees and by union solicitors (including the two who obtained the signatures on most of the 18 cards in question) that "they wanted to get enough signatures on the cards so that if they got a majority of signatures, they could have an election"; that "they needed a certain percent of the employees to sign cards in order to get a vote"; that "signing of the card was for the purpose of getting an election and was not itself a vote"; and that "just because an employee signed the card, this did not mean that he was joining the Union."

Fourth, two of the most active union solicitors of signatures on the authorization cards were union committee members Alice DeMaria and Dominick Mandicott (both of whose cards were included among the 18 accepted as valid because, according to the Board's finding, they were told that obtaining an election was *one* purpose, not the *sole* purpose, of signing the cards). DeMaria testified as follows regarding what *she* was told about signing the cards and what she in turn told *others* from whom she obtained signed cards:

"Q. Now, did Mr. McCauley [the union organizer] give a talk that night? A. Yes, he did.

Q. Will you tell us in your own words what Mr. McCauley said about the cards, one of which you finally signed yourself? A. He gave us cards or asked us if we would take the cards. *He said they would be a vote only—only a vote towards an election.*

Q. And did you attend any further meetings? A. Yes.

Q. Let me ask you whether or not these cards were discussed at the other meetings that you attended? A. Yes, they were.

Q. And who spoke about the cards at that time? A. Mr. McCauley.

Q. Mr. McCauley? A. McCauley, that's right.

Q. Can you tell us your best recollection as to what Mr. McCauley said about the cards at these other meetings? A. Well, he said that we would need a certain percent in order to get a vote for the Union.

Q. And did you take some of these cards yourself? A. Yes, I did.

Q. Now, you testified here that you signed Exhibit 10–J that night on July 16th, 1963; is that right? A. Yes.

Q. And did you sign this card after Mr. McCauley had talked about the cards? A. Yes, I did.

* * * * * *

Trial Examiner: What all were you told with reference to the card before you signed it?

The Witness: *That is* (sic) *was only a vote towards an election.*

Trial Examiner: *Anything else?*

The Witness: *No. It was just a vote to see if they could have an election if they got the majority of the people.*

Q. (By Mr. Levene) *Did you sign this card relying upon that statement? A. I did."*

* ' * * * * *

"Q. And subsequent to signing your own card, did you pass out cards to other employees? A. Yes, I did.

Q. Have you any present recollection as to whom you passed out the cards to? A. Well, there was Rose Brown, Betty Stanley, Helen Wilcox, Arlene Kruger—

Q. In other words, those are those that you presently remember? A. Yes, sir.

Q. Now, did you tell anything to the persons to whom you delivered these cards? A. Yes.

Q. And will you tell us in your own words what you told these persons with respect to the cards when you delivered the cards? A. *I told them that it was only for a vote so they could have an election; and if the election came up, we could vote either way we wanted to."* (Emphasis added.)

Of the 4 employees to whom DeMaria passed out cards and to whom she said the cards were *"only* for a vote so they could have an election," only the card of Betty Stanley was excluded; the cards of Rose Brown, Helen Wilcox and Arlene Kruger, as well as that of DeMaria, were counted in determining the majority status of the union.

Mandicott, the other active union solicitor, after testifying that he signed his card "for the purpose and the *only* purpose of getting an election" (emphasis added), went on to testify at length that he told numerous other employees from whom he obtained signed cards substantially the same thing—"the *only* purpose of the card was to get an election and it wasn't to count as a vote"—"this was to get an election and it wasn't to be a vote" —"the purpose of this card was *only* to get an election and was not to count as a vote"—"they had the perfect right, even though they signed the card, to change their mind." (Emphasis added.) Regarding instructions given by Mc-

Cauley, the union organizer, Mandicott testified as follows:

"Q. And Mr. McCauley; did he make any speech with respect to the cards? A. Yes, he made a speech.

Q. Let me ask you this specific question: *Did Mr. McCauley in any speech make any statement at a meeting that you were present at that the purpose of obtaining signatures to these cards was only for the purpose of obtaining an election?*

\* \* \* \* \* \*

Mr. Levene: Give us your best recollection.

The Witness: *As far as the signatures on these cards was for an election, it would count as an election for a vote. It would actually have to be a vote to get enough cards to have an election.*

Q. (By Mr. Levene) In other words, your understanding was that these cards were distributed for the purpose of getting enough votes for an election? A. Enough cards.

Q. Enough cards for an election? A. That's right.

Q. It wasn't your understanding that these cards would be the election? A. No." (Emphasis added.)

And, in response to questions by the trial examiner, Mandicott testified as follows as to his understanding in signing his own card and what he told other employees whose cards he obtained:

"Mr. Trial Examiner: When you signed your card, what did you understand the purpose of signing it was for?

The Witness: Well, I understood we would sign the cards and would go down to the Union meetings and take it from there before the election to understand more about the Union.

Trial Examiner: Signing the card was—

The Witness: *I understood that signing the card was for the purpose of getting enough signatures in order to have an election. They need-* ed *a certain percentage of signatures in order to have an election. This is what I understood.*

Trial Examiner: *That's generally what you told the employees that you gave cards to?*

The Witness: *That's right.*

Trial Examiner: All right. *Did you or did you not understand that the signing of that card was in any way authorizing the Union to be your representative or just that it was for an election?*

The Witness: Just like I says, when the cards were handed to me by Charlie, he says, 'Get enough cards signed so we get enough down there.' *'We will have to get enough cards signed in order to have an election.'* I started to go down to the meetings. When it came time for the election, I understood that if I didn't care for what the Union was going to give or what they could do—I didn't understand what they could do—and as far as they could go as far as the Union." (Emphasis added.)

Fifth, the Board's conclusion that "by executing such a clear and unambiguous card an employee shows, at least *prima facie*, that he wants the union to represent him," is completely meaningless when more than half of the controversial 18 cards were signed by employees who either did not read them, or who could not read them, or who did not know the meaning of the words "represent me in collective bargaining." The "employees of respondent are not grammarians." N. L. R. B. v. Miller, 341 F.2d 870, 874 (2 Cir. 1965); "[t]hey were all illiterate persons with only a most rudimentary acquaintance with English." N. L. R. B. v. Dadourian Export Corp., 138 F.2d 891 (2 Cir. 1943); "The Board refused to count one of these cards because the employee who signed it \* \* \* was unable to read, and executed the card because the Union adherents soliciting him to do so represented to him that the Union card would only be used to obtain an election." Jas. H. Matthews & Co. v. N. L. R. B., 354 F.2d 432 (8 Cir. 1965).

The situation presented by the record before us is an entirely different matter from where "an employee's thoughts (or afterthoughts) as to why he signed a union card and, what he thought that card meant, cannot negative the overt action of having signed a card designating a union as bargaining agent." See, e. g., Colson Corp. v. N. L. R. B., 347 F.2d 128, 135 (8 Cir. 1965); Joy Silk Mills, Inc. v. N. L. R. B., 185 F.2d 732, 743 (D.C.Cir. 1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951). Here the record shows conclusively, and both the Board and examiner have found, that a large number of employees whose cards were counted in determining a union majority status did not or could not read the cards they signed; hence the fraud which vitiates their consent to union representation is *not* based on the thoughts or afterthoughts of the *employees,* but, as found by the Board and examiner, upon the undisputed misrepresentations of the union organizers and union solicitors in procuring signatures on the cards.

In short, the use of union authorization cards, long recognized by the Board and the courts, including our own, as a "notoriously unreliable method of determining majority status of a union," becomes even more notorious and less reliable in the context of the Board's rule here in question distinguishing between the degrees of fraud on the part of union solicitors which will be condoned. At best, the rule is a device for imposing a result-oriented viewpoint; at worst, it injects into the delicate area of labor-management relations—where the basic Congressional purpose of industrial peace and stability should be paramount—a wholly irrational basis for determining union majority status. The distinction upon which the Board's rule is predicated, it seems to me, comes perilously close to the "little bit pregnant" notion. I would root it out here and now as representing neither good logic, nor good sense, nor good law.

After all, it is the *employees'* rights guaranteed under Section 7 with which we are here concerned, including their rights "to self-organization," "to bargain collectively through representatives of their own choosing" and "to refrain from any or all such activities." The employees here involved were minimally literate at best—a situation far from uncommon. The follow the leader tendency was strong. Largely unfamiliar with NLRB procedure, they could hardly be expected to know, for example, that if enough of them signed cards "to get an election" or "to get a vote"—the primary thrust of the union organizers' solicitations—there very well might not be an election or a vote. And to permit the vice of such solicitations to turn upon whether an election or a vote was said to be the *sole* purpose or *a* purpose of signing the cards, is wholly to ignore *whose* rights are intended to be guaranteed by Section 7. Upholding the Board's rule here, based on this irrational distinction, may pull this *union's* chestnuts out of the fire; but it surely will open the door to future organizational sharp dealing, to the detriment of the very *employees'* rights we seek to safeguard.

I find particularly unpalatable the thesis that an employer's Section 8(a) (1) violations should foreclose the raising of issues of union deception in violation of employees' Section 7 rights. I recognize the practical difficulties of arriving at the truth in a situation as vibrant as that disclosed by the record before us. But, with deference, I do not believe we can be true to the Congressional purpose unless, in view of the notorious unreliability of representation cards, we insist that the Board impose a high fiduciary duty of full, accurate and fair disclosure upon the soliciting union. To refrain from affirmative deception is not enough; the responsibility of furnishing specific, relevant information to enable employees who are solicited to make an informed decision should be squarely on the union, and the burden of validating union representation cards should be commensurate with that responsibility. The Board's rule, for which it seeks our

sanction in this case, falls far short of that standard. I would reject it.

In N. L. R. B. v. Dadourian Export Corp., supra, we refused to enforce a collective bargaining order of the Board on the ground that the votes necessary to a union majority upon which the Board relied were procured by means which vitiated the consent of the employees. Judge Learned Hand stated (138 F.2d 891, 892–893):

"Fraud—which this was—will vitiate consent as well as violence, and the Board itself implies that a vote procured by violence should not be counted. It is quite true that only an employer can be guilty of 'unfair labor practices,' (§ 8), but § 7 confers the right on all employees freely to choose their bargaining representatives, and the invasion of that right is as much a wrong, when committed by a union organizer as by an employer. The fact that when it is not committed by an employer, the Board has no power to use its peculiar remedies to effectuate the policies of the act, must not blind us to the fact that those policies include employees' freedom from interference with their choice of representatives from any source whatever.

\* \* \* \* \* \*

"As we have said, the Board might have refused to believe the witnesses at all, but if it did not, the issue involves a construction of the law: i. e. the scope of the right to choose representatives. Nothing in the books suggests that in the end the courts have not that responsibility.

\* \* \* \* \* \*

"Since the issue is of protecting the rights granted to all employees by the act, its policies are as much frustrated whether an authorized agent of the union is the actor or someone else; for the overriding consideration must always be the employees' untrammelled freedom of choice; upon that the whole framework rests. Moreover, even were we to disregard that dominant consider-

ation, the right of a union to act as bargaining agent depends upon the votes of the employees, and, if it accepts and uses their votes, it necessarily ratifies the means by which they have been procured, even though it did not authorize them in the first instance. That follows from ordinary principles of agency. We hold that the four votes should not have been counted, and that the union was never chosen by a majority of the 'unit' as its bargaining agent."

Finally, I do not believe upon this issue—the validity of the Board's rule based on the degree of fraud on the part of union solicitors which will be condoned in determining majority status of a union—that we as a reviewing court appropriately may pass off the issue as one on which the Board's findings should be sustained if supported by substantial evidence on the record considered as a whole. Here "the issue involves a construction of the law; i. e. the scope of the right to choose representatives." N. L. R. B. v. Dadourian Export Corp., supra, at 893. And "[n]othing in the books suggests that in the end the courts have not that responsibility." Ibid. "[W]here, as here, the review is not a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, '[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.' American Ship Building Co. v. Labor Board, supra at 318." N. L. R. B. v. Brown, supra at 292. "Courts must, of course, set aside Board decisions which rest on an 'erroneous legal foundation.' Labor Board v. Babcock & Wilcox Co., supra at 112–113". Ibid.

*Good Faith*

In view of the serious doubt of the validity, as a matter of law, of the Board's rule here invoked for determining majority status of the union on the date of the union's demand for recogni-

tion and bargaining, it cannot be said that respondent did not have a good faith doubt in questioning the union's majority as of that date. In Edward Fields, Inc. v. N. L. R. B., 325 F.2d 754, 761 (2 Cir. 1963), we said:

> "The employer cannot be held for refusal to bargain on the ground that he himself destroyed the union majority by his unfair labor practices *when he was unaware at the time the unfair labor practices were committed that the union at any time had a majority. The employer is free at all times to demand proof as a condition of bargaining. The duty to bargain arises only at such times as the union representative presents convincing evidence of majority support.* N. L. R. B. v. Dahlstrom Metallic Door Co., [112 F.2d 756 (2 Cir. 1940)]. Further, there is no authority for the proposition that a violation of § 8(a) (5) may be predicated merely on evidence that an employer bargained with a minority group at a time when a union demanded recognition. *In such circumstances, the decision as to violation of § 8(a) (5) must depend on whether the employer had a good faith doubt as to majority status. Otherwise he would be guilty of refusal to bargain even though there was no duty to bargain.*" (Emphasis added.)

In the insant case, the union's letter of August 22, 1963 addressed to respondent's vice president, Herbert M. Davis, claiming the union represented "the majority of your employees at your plant" and requesting collective bargaining, was received on Friday, August 23. The union did not then or at any other time "[offer] the employer the opportunity to cross-check membership cards." Edward Fields, Inc. v. N. L. R. B., supra at 760; compare Joy Silk Mills, Inc. v. N. L. R. B., 185 F.2d 732, 741 (D.C.Cir. 1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951). Davis conferred the same day with respondent's secretary, Jesse D. Klingman, and inquired "whether or not in [his] opinion there was any validity to the statements made by the Union." Klingman replied that he "was in no position to know." Davis said, "Well, what do we do about it?" Klingman replied, "As far as I'm concerned, Herb, there is only one way to find out. Let's go out and find out." Thereupon (still Friday, the same day the union's letter was received), Klingman called plant superintendent Testani into his office, showed him the union's letter and "I asked Tony [Testani] to go with me to various departments in the factory and told him that I was going to attempt to get some reasonable answers so that we could sensibly answer the letter." During the balance of Friday, August 23, and throughout Monday, August 26, Klingman and Testani surveyed each department of the factory (the packing room, the shipping room and the lasting and making room on Friday; the sole room, the fitting room and the cutting room on Monday). They talked to as many employees as they could contact in the available time. In Klingman's words, "I was trying to get a poll, in my own mind, to have a decent answer to give Herb as to whether this letter was correct * * * From what I had been told by the various employees to whom I had spoken, it was my belief that the Union did not represent a majority as they had told us in this letter which had been shown to me by Herb Davis." Later on Monday, August 26, Klingman met with Davis and "informed him of what my own opinion was as to this. I suggested that in view of the letter we received by registered mail, that this required a prompt and sensible answer and that he get in touch with [respondent's] attorney." On Tuesday, August 27, Davis met with respondent's attorney. On Wednesday, August 28, Davis wrote to the union advising "that we do not believe that your organization represents a majority of our employees in the appropriate unit for the purposes of collective bargaining. We therefore cannot recognize your organization as bargaining agent."

In short, within five days from receipt of the union's letter, including a weekend, respondent, through its responsible officers, carefully surveyed its employees and replied to the union's claim of majority representation. I fail to see what greater degree of good faith could reasonably be expected on the part of respondent in questioning the union's claim of majority status.

In the meanwhile, McCauley, the union organizer, without waiting for a reply to the union's letter of August 22 and without affording respondent any reasonable opportunity—either by cross-checking membership cards with the payroll, or by polling the employees, or by any other method—to verify the union's claim of majority representation, on *Sunday, August 25, prepared a petition for certification of representatives*. This petition was mailed to the Board on either August 28 or August 29, and was filed on August 30. By thus instituting a Section 9(c) representation proceeding (to determine whether the union was entitled to recognition for collective bargaining purposes), rather than a Section 8(a) (5) unfair labor practice proceeding (based on a refusal to bargain with representatives of respondent's employees), the union itself indicated its own doubt as to whether it represented a majority of respondent's employees. See N. L. R. B. v. Dan River Mills, Inc., 274 F.2d 381, 386–389 (5 Cir. 1960). Upon facts virtually identical to those in the instant case upon the issue of good faith, the court concluded in Dan River Mills, supra at 389:

"[I]t was reasonable for the Employer to assume that the law would resolve its good faith doubt concerning the Union's majority by the election requested and shortly ordered. The subsequent dismissal of those proceedings with the filing of the unfair labor complaint cannot deprive its interim actions of that cloak of reasonableness and good faith doubt. The order as to § 8(a) (5) may not, therefore, stand."

The issue of good faith in the instant case is sharply to be distinguished from that presented in such cases as Irving Air Chute Co., Inc. v. N. L. R. B., 350 F.2d 176, 181, 182 (2 Cir. 1965) (Union "offered to submit the cards to a count by an impartial person such as a priest, minister or rabbi"; "[i]t is uncontested that the Union held a valid card majority at the time of its * * * bargaining demand"; the Company "never * * * expressed a doubt that majority status had been achieved"); N. L. R. B. v. Dahlstrom Metallic Door Co., 112 F.2d 756, 757 (2 Cir. 1940) ("union offered to submit the signed membership cards, but this offer was not accepted"; "Respondent 'made no effort to learn the facts and took the chance of what they might be,'" citing N. L. R. B. v. Remington Rand, Inc., 94 F.2d 862, 869 (2 Cir. 1938), cert. denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540 (1938)); Jas. H. Matthews & Co. v. N. L. R. B., 354 F. 2d 432 (8 Cir. 1965) ("the Union was prepared to prove its majority status"; "[i]t is clear that the Union was at all times here relevant ready and willing to demonstrate its majority status to petitioner"); Happach v. N. L. R. B., 353 F. 2d 629 (7 Cir. 1965) ("union offered a card check to show its majority"; "[a]t no time did [the company] express any doubt as to the union's majority").

No court has ever held, upon the facts disclosed by the record in the instant case, that an employer acted in bad faith in questioning the union's majority and refusing to bargain until the union presented convincing evidence of majority support—where the union at no time offered the employer an opportunity to check the membership cards—where, following the union's claim of majority representation, the company promptly surveyed its employees and notified the union of its doubt as to the validity of the union's claim—where the union, without waiting to hear from the company in response to the union claim of majority representation, prepared a petition to institute a representation proceeding to de-

termine the very fact the company doubted, i. e. whether the union was entitled to recognition for collective bargaining purposes—and where in the end the Board, in order to find the union had a card majority, had to resort to counting cards obtained from 18 employees who were told by union organizers and solicitors that their purpose was, *not* to authorize the union to represent them in collective bargaining, *but* "for a vote" or "to have an election."

Upon this showing, I would think we had no alternative but to hold that respondent had a good faith doubt in questioning the union's majority and in refusing to bargain until the union presented convincing evidence of majority support. I would so hold. Edward Fields, Inc. v. N. L. R. B., 325 F.2d 754, 761 (2 Cir. 1963); N. L. R. B. v. James Thompson & Co., 208 F.2d 743, 745–748 (2 Cir. 1953).

*Remedy*

Since in my opinion, for the reasons stated above, the Board's findings that respondent refused to bargain collectively with the union in violation of Section 8(a) (5) are not supported by substantial evidence on the record considered as a whole, the appropriate remedy is one adequately to deal with the unfair labor practices in violation of Section 8(a) (1). I would enforce the Board's order (i) that respondent cease and desist from these violations (with the exception of the alleged no-solicitation rule violation, as to which I would modify the Board's order) and (ii) that respondent take certain affirmative action with respect thereto by posting an appropriate notice. I would deny enforcement of the Board's bargaining order and would direct the Board to conduct a new election after a reasonable passage of time and an opportunity for further persuasion by the union.

Judge Anderson's well reasoned opinion in N. L. R. B. v. Flomatic Corp., 347 F.2d 74, 77–80 (2 Cir. 1965), sets forth admirably the rationale, based on sound public policy and grounded on the clear Congressional purpose underlying the Act, for rejecting a bargaining order and directing a new election. I adopt Judge Anderson's opinion and would apply it in the instant case; for in Flomatic, as the majority here recognizes, there was "a situation bearing some similarities to the situation with which we are faced in the present case." Indeed, certain critical indicia present in the instant case point at least as strongly as in Flomatic, perhaps more so, to the propriety of a new election rather than a bargaining order. Here there was substantial doubt as to the union's card majority; in Flomatic there was a 20 to 8 card majority a month before the election. Here there was substantial doubt as to whether large numbers of employees in signing the cards were actually authorizing the union to represent them or merely seeking the opportunity for a vote or an election; there was no such confusion in Flomatic. Here the employer, in a good faith attempt to investigate the union's claim of majority representation, promptly surveyed its employees and responded to the union's claim on the basis of an informed judgment; there was no occasion for this in Flomatic. Here the union itself, obviously doubting its own majority status, prepared a petition for a representation proceeding without awaiting the employer's response to its claim of majority status; in Flomatic the union petitioned for an election without waiting for a reply to its letter to the employer asking for recognition.

The most fundamental consideration here, however, as Judge Anderson clearly indicated in Flomatic, is whether "the imposition of such [bargaining] order may unnecessarily undermine the freedom of choice that Congress wanted to guarantee to the employees, and thus frustrate rather than effectuate the policies of the Act." 347 F.2d 74, 78. Having in mind the extraordinarily tenuous basis disclosed by the record in the instant case for the union's asserted majority status two and one half years ago, it can be said with at least equal force here, as in Flomatic, that "if the union is permitted for some time to continue

as the bargaining representative—more than two years after obtaining a card majority—this may vitiate the employees' freedom of choice in any subsequent election * * . *." 347 F.2d 74, 80.

Judge Castle has cogently summed up the critical issue here involved in his perceptive dissenting opinion in Happach v. N. L. R. B., 353 F.2d 629 (7 Cir. 1965):

"In my opinion the record clearly demonstrates that the circulator of the union authorization cards, employee Marvin Dixon, understood, and that he gave the employees who signed the cards to understand, that the execution of the cards was for the purpose of obtaining an election in which they could express their choice on the question of union affiliation. The Union's reliance upon such cards as evidencing its attainment of the status of collective bargaining representative for the employee unit involved is therefore not justified, and in such circumstances an order that the employer bargain with the union is improper. N. L. R. B. v. Koehler, 7 Cir., 328 F.2d 770. The fact that the employer was subjectively in 'bad faith' in refusing to bargain with the Union —was unaware of the understanding of the circulator and the representation he had made to the other employees in obtaining their signatures—is not a basis for imposing a penalty on the employees in the form of representation by a Union they have not chosen to represent them. On the record in the instant case an order to bargain is inconsistent with the basic purposes of the National Labor Relations Act. It defeats, rather than contributes to, industrial peace and stability in labor-management relations."

In Judge Anderson's characteristically apt language in Flomatic, "A bargaining order * * * is strong medicine." In the instant case, it would be the wrong prescription altogether; whatever its deterrent effect might be on the employer, as a cure for the primary patient, the employees, it would be far worse than the ailment.

### SUMMARY

To summarize:

(1) I would enforce the Board's order that respondent cease and desist from specified unfair labor practices in violation of Section 8(a) (1), but I would modify the order so as to adopt the trial examiner's recommendation to dismiss the charges alleging an unlawful no-solicitation rule.

(2) I would enforce the Board's order requiring respondent to take certain affirmative action with respect to the Section 8(a) (1) violations by posting an appropriate notice.

(3) I would deny enforcement of the Board's order that respondent bargain collectively with the union, but I would direct the Board to conduct a new election after a reasonable passage of time and an opportunity for further persuasion by the union.