**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**CONSOLIDATED RENDERING COMPA-
NY, d/b/a Burlington Rendering
Company, Respondent.**

Nos. 55, 56, Dockets 31183, 31184.

United States Court of Appeals
Second Circuit.

Argued Sept. 29, 1967.

Decided Dec. 11, 1967.

Hans J. Lehmann, Atty., NLRB (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman, Atty., NLRB, on the brief), for petitioner.

William F. Joy, of Morgan, Brown, Kearns & Joy, Boston, Mass., for respondent.

Before LUMBARD, Chief Judge, and SMITH and KAUFMAN, Circuit Judges.

### J. JOSEPH SMITH, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order issued October 14, 1966, finding Consolidated Rendering Company had violated § 8(a) (1) and (5) of the National Labor Relations Act, ordering it to cease and desist from violations and ordering it to bargain with a Union representing its employees. We grant enforcemnet of the Board's order.

In June 1965, the Union [1] began an organization campaign at the Company's [2] plant in Burlington, Vermont. By August 2, twenty-one out of twenty-eight production and maintenance workers had signed union authorization cards. The Union informed the Company of its majority status, and requested recognition as the employees' exclusive collective bargaining agent. The Union offered to demonstrate proof of its majority status. On August 3, the Union filed a representation petition with the Board. The next day the Company replied to the Un-

ion's request for recognition, stating that it had a good faith doubt as to the Union's majority status. It did not specify what that good faith doubt was. On August 24, the Union and Company entered into a consent election agreement. An election was held on September 15 in which the Union was defeated. The Union filed objections which the Regional Director's ex parte investigation found insufficient to warrant setting the election aside. On November 24 the Union's request for review of the Regional Director's determination was granted. The next day the Company announced increased wages, vacations, and other fringe benefits. On December 8 the Regional Director issued a Complaint based upon the Union's objections to the election. Those objections and the refusal to bargain charge filed by the Union during the summer were consolidated for a hearing that was held in March of 1966.

The Trial Examiner and the Board found that the Company had violated § 8(a) (1) through its agents' threats and promises aimed at interfering with its employees' § 7 rights. They found that the Company had violated § 8(a) (5) by refusing to bargain with the Union when requested, without a good faith doubt as to the Union's majority status, and by unilaterally changing wages and fringe benefits on November 25.

The Board ordered the Company to cease and desist from engaging in the unfair labor practices alleged under § 8 (a) (1), and to bargain with the Union upon its request. The bargaining order is the heart of the appeal since none of the § 8(a) (1) violations alleged or proscribed are of a continuing nature.

### The Union's Majority

The Trial Examiner found, and the Board agreed, that by August 2 the Union had obtained majority status. This finding was based upon the Union's obtaining signed authorization cards,

1. Amalgamated Meat Cutters, Foodstore & Allied Workers of North America, Local Union No. 33, AFL-CIO (the Union).

2. Consolidated Rendering Company d/b/a Burlington Rendering Company (the Company).

702

which the Trial Examiner and Board found valid, from 21 out of 28 employees in the bargaining unit. This court has often held that a valid card majority is convincing evidence of a Union's majority status. NLRB v. Gotham Shoe Mfg. Co., 359 F.2d 684, 686 (2d Cir. 1966); NLRB v. Philamon Laboratories, Inc., 298 F.2d 176, 179 (2d Cir.), cert. denied 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962); NLRB v. Sunrise Lumber & Trim Corp., 241 F.2d 620 (2d Cir.), cert. denied 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34 (1957). In NLRB v. River Togs, Inc. (2d Cir. July 27, 1967) 382 F.2d 198, however, we recognized some of the limitations of the authorization card procedure, calling for scrutiny of the manner of execution of the cards. Here the cards were not signed heedlessly, but many were taken home and discussed with the employees' wives prior to their signing.

■ The Company attacks 10 of the 21 cards obtained by the Union on various grounds. Rulings on credibility are, of course, for the Trial Examiner and the Board. See, e. g. Mak-All Mfg., Inc. v. NLRB, 331 F.2d 404, 405 (2d Cir. 1964).

■ The Company contends that two of the authorization cards were signed by employees, Rabidoux and Gelinas, who were barred from the bargaining unit because they were supervisors. The Trial Examiner's finding that they were regular employees, however, was amply supported by the fact that they did not receive pay raises when they were allegedly made supervisors, nor, as the record indicates, were they required or requested to attend the Company's meeting for supervisors held during the Union's organization campaign. Three cards were challenged because they were solicited by Rabidoux. See NLRB v. Hamilton Plastic Molding Co., 312 F.2d 723 (6th Cir. 1963). Since we have determined that the Trial Examiner was justified in holding that Rabidoux was

not a supervisor, this challenge to the validity of the union authorization cards must fall also. One authorization card was challenged on the ground that the Union misrepresented that it had obtained a majority at that time. The evidence, however, indicates that the Union had obtained a majority at the time it was signed. Another card was challenged because the signer was allegedly misled by the statement that "a greater share" of the employees had signed. There was no misrepresentation shown in the use of the term "a greater share," and the Trial Examiner's refusal to hold the card invalid was correct.

■ Three cards were challenged on the ground that the signers had been told that the cards would not be shown to anyone. The Board argues that this does not detract from the reliability of the cards so as to justify their invalidation. We agree. Compare NLRB v. Southbridge Sheet Metal Works, Inc., 380 F.2d 851, 856 (1st Cir. 1967). Another card was challenged on the basis of an alleged misrepresentation and threat as to the consequences of not signing a card. The testimony concerning this charge was contradictory, and the Trial Examiner was not required to find it established.

■ The Company argues that two of the cards were signed by temporary employees. One employee, Bessette, was still working for the Company at the time of the Trial Examiner's hearing. He may have been a probationary employee, but there is no evidence that he was a temporary one. The other employee, Richard Gonyea had worked for the Company for over three months. At the hearing he denied ever having been told that he had been hired as a temporary employee. His credibility was a question for the Trial Examiner and he resolved it against the respondent.

■ The validity of three of the authorization cards included in the Union's card majority [3] is also attacked

3. The number of challenges is greater than the total number of cards challenged be-   cause a number of cards were challenged for more than one reason.

on another ground. Three employees testified that they were told that the cards would be used only to secure an election. See NLRB v. S. E. Nichols Co., 380 F.2d 438 (2d Cir. 1967). But even if these cards are eliminated, the Union is still left with a clear card majority; nor does it follow that because some were signed under the impression that the cards would be used for a specific purpose, that the balance of the cards are invalidated. NLRB v. Gotham Shoe Mfg. Co., 359 F.2d 684 at 686.

### Violations of § 8(a) (1)

There is sufficient evidence from which the Board could conclude that the Company was trying to coerce its employees not to join the Union, in violation of § 8(a) (1) of the Act. In July the Company's Assistant Manager threatened an employee, Gover, with loss of time and other changes in working conditions if he continued to be pro-union. At about the same time, the Plant Superintendent told another employee, Dunham, that the plant might be closed if the Union got in. While there was some conflict in the evidence with respect to these incidents, the issue of credibility is for the Trial Examiner and Board to resolve. *Mak-All Mfg., Inc.,* supra.

Moreover, the Plant Superintendent admittedly questioned two employees, Bessette and Gonyea, in his office. The Company describes these conversations as "innocuous" but, under similar circumstances, we have allowed employees to be interrogated only under the strictest safeguards. The employer must:

"* * * (1) have reason to conduct the interviews, (2) advise the employee of the reason for the inquiry and (3) there be no threats or promises of benefit." Edward Fields, Inc. v. NLRB, 325 F.2d 754, 758 (2d Cir. 1963).

Though the Company may have had a reason for its inquiry—presumably doubt as to the Union's majority status —the Company never did advise the questioned employees of its reason for the questioning. In *Fields* we noted that:

"[Even if] the language of the specific questions, as to Union membership, was not intimidating, in itself * * * the interrogations became coercive when conducted by a highly placed official in his office and at his request." 325 F.2d at 759.

This is especially true in a small plant, in a relatively small community, where the workers quickly get the message of their employer's anti-union attitude.

In addition, the Plant Manager made promises and threats to an employee, Ralph Gonyea. Though the employee and Plant Manager gave different accounts of the incident, the Trial Examiner decided the issue of credibility against the Company. Finally, the Plant Manager and his assistant warned an employee, Dunham, not to do anything foolish with respect to the Union. Though some of these incidents considered individually might conceivably not yield the conclusion that § 8(a) (1) had been violated, viewing the record as a whole, and taking them together, as we must, it is apparent that the Board's conclusion that the Company coerced its employees in violation of the Act is amply supported.

A bargaining order, in addition to the cease and desist order, was a proper remedy for the Company's violations of § 8(a) (1) of the Act. The Company by its own conduct has caused the Union's majority to be dissipated and made the holding of a free election impossible. See NLRB v. Gotham Shoe Mfg. Co., 359 F.2d at 687. The Company's conduct in this case is not comparable with that in NLRB v. Flomatic Corp., 347 F.2d 74 (2d Cir. 1965). In the latter case we were dealing with "a borderline, unaggravated § 8(a) (1) violation, standing alone, occurring prior to the election * * *" 347 F.2d at 79. There was no demand and refusal to bargain. Here, however, Consolidated Rendering's conduct as shown by the record before us on

appeal evidences a consistent program of coercion.

### Violations of § 8(a) (5)

 It is clear that the Union's request for an election does not constitute a waiver of its bargaining demand based upon the card majority which the Board properly found it possessed. Irving Air Chute Co. v. NLRB, 350 F.2d 176, 182 (2d Cir. 1965). The Board had more than sufficient grounds to conclude that the Company did not have a good faith doubt concerning the Union's majority status when it refused to bargain. The Board found that the Company had independent evidence of the Union's majority from the talks which its representatives had with its employees. Under these circumstances and with the Union claiming so large a majority of signed cards whose authenticity the Company did not dispute, the Board properly considered a generalized and unsupported claim of good faith doubt to be insufficient. Moreover it was not inappropriate for the Board here to consider the Company's conduct both before and after the Union filed a representation petition with it. Throughout the Union's organization campaign it was met by the Company's violations of § 8 (a) (1) of the Act. The Board was justified in inferring from the Company's independent knowledge of the Union's majority and its violations of § 8(a) (1) that its refusal to bargain was based not on good faith doubt concerning the Union's majority status, but rather on its anti-union animus.

If the Union did represent the majority of the employees, it was the Company's duty to bargain with it before changing wages or fringe benefits. Unilateral changes in working conditions about which the parties are obligated to bargain are so disruptive to the collective bargaining relationship that they violate § 8(a) (5) without any showing of subjective bad faith. NLRB v. Katz, 369 U.S. 736, 746–747, 82 S.Ct. 1107, 8 L.Ed. 2d 230 (1962). Here the Union had a clear majority, dissipated by the Company's conduct before the election, with the Company immediately thereafter adopting the union scale to demonstrate that payment of union dues would indeed have been a waste of money.

Where § 8(a) (5) has been violated by an employer who "has refused to bargain, under circumstances in which he was under a duty to do so * * * the remedy [a bargaining order] may be thought uniquely appropriate." NLRB v. Flomatic Corp., 347 F.2d at 79. The Board's bargaining order is amply justified both under § 8(a) (1) and under § 8(a) (5).

Enforcement granted.