**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BIG BEN DEPARTMENT STORES, INC., Respondent.**

Nos. 383 and 384, Dockets 31640, 31641.

United States Court of Appeals
Second Circuit.

Argued April 3, 1968.

Decided May 22, 1968.

J. Richard Thesing, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Lawrence M. Joseph, Washington, D. C.), for petitioner.

Martin H. Scher, Mineola, N. Y., of counsel (Harry H. Rains, Mineola, N. Y.), for respondent.

Before MOORE, WOODBURY * and SMITH, Circuit Judges.

WOODBURY (Senior Circuit Judge):

The respondent operates a department store in Poughkeepsie, New York.[1] It operates some of its departments itself. Other departments, including the shoe department, are operated by lessees. The trial examiner for the Board found, and it is admitted, that Big Ben and each operator of a leased department are joint employers of the employees in the leased departments and that Big Ben and all operators of leased departments together constitute a single employer for the purposes of the Act.

On July 20, 1965, Local 888, Retail Clerks International Association, AFL–CIO, began to organize the employees in the respondent's store, including the employees in the leased departments. The union organizers carried on their campaign openly, at first without let or hindrance by the management. Management only asked the union organizers to refrain from interfering with employees at their work, which seems to have been more honored in the breach than in the observance, for the trial examiner found that the union organizers in fact solicited employees on and off the selling floor during work time as well as non-work time.

On July 21 the lessee of the shoe department, Morton's Shoe Stores, Inc., hired one Peter Papastrat as a clerk, and on the next day, July 22, he accosted a young woman employed by Big Ben as she approached the time clock to check in after her lunch period and solicited her to sign a union card. She refused and promptly reported the incident to Big Ben's personnel manager who at once discharged Papastrat saying that a more experienced man was required.

The testimony of the participants in the incident differs substantially. The personnel manager testified that the young woman came to him emotionally upset and in tears, told him that Papastrat had "maneuvered" her into a corner and had tried to "force" her to join the Union against her will and appealed to him to get Papastrat "off her back." The young woman testified that Papastrat had stopped her in the hall and

---

* Of the First Circuit, sitting by designation.

1. The facts essential for the jurisdiction of the Board and of this court are admitted.

"explained the Union" to her and, when he persisted in his solicitation in spite of her rebuff, she left him. She admitted that she was visibly agitated as a result of the encounter but denied that she was reduced to tears. Papastrat testified that he talked to the young woman only a moment or so and used no undue persuasion. The trial examiner found that Papastrat did not in fact resort to any improper tactics. Crediting the young woman's version he found that all the testimony shows is that Papastrat persisted in his solicitation despite his rebuff and that the young woman became disturbed over the incident persumably because of her youth and inexperience.

The trial examiner found that by discharging Papastrat Big Ben had violated § 8(a) (1) and (3) of the Act. But, finding no evidence that Morton's Shoe Stores, Inc., was in any way responsible for Papastrat's discharge, he recommended dismissal of the complaint as to it.

On August 10 company management met by appointment with Union officers who submitted about 40 signed union authorization cards and requested union negotiation.

The testimony is conflicting as to details, but it is clear that the company officers looked at the cards, did not directly question either their authenticity or that 40 constituted a majority of the appropriate bargaining unit [2] and agreed to arrange by telephone on August 14 for a further meeting to discuss recognition. On August 14 one of the Union officers telephoned the Company's secretary-treasurer and principal negotiator but was told that he was not in town. On August 15 a Union officer sent a telegram to the respondent reciting some of the events of August 10 and asking for an appointment to meet to negotiate a contract. The respondent did not reply to this telegram and on August 18 the Union officer called the respondent's secretary-treasurer on the telephone again for an appointment but was told by the latter that no decision as to bargaining had yet been reached. On August 25 the Union officer wrote the secretary-treasurer a letter reciting past efforts to meet and requesting a meeting on August 30. This letter was not answered and on August 30 the respondent filed a petition for an election with the Board which the Board dismissed on December 17 because of the pendency of the present case.

The trial examiner resolving conflicting testimony on the basis of relative credibility found (1) that at the August 10 meeting the respondent's secretary-treasurer and principal bargaining representative acknowledged by his inspection of the union authorization cards then submitted to him that the Union appeared to have a card majority, (2) that he did not otherwise raise any question as to the Union's majority status, (3) that while there was discussion on August 10 of a Board election as an alternative to recognition based upon cards, neither the respondent nor the Union proposed that there be an election, and (4) that the respondent did not agree to open contract negotiations with the Union on August 10 or at any time thereafter. On the basis of these findings the trial examiner concluded that the respondent had no reasonable doubt of the Union's majority status and that its refusal to bargain was in bad faith. He accordingly found that the respondent had violated § 8(a) (5) of the Act.

During the summer of 1965 the respondent's management increased holiday pay from time and a half to double time. The exact date when this decision was made is in dispute. The respondent contends that decision was reached sometime before the Union began its organizing campaign and there is some evidence to support this contention.

2. It is agreed that the unit of the respondent's employees appropriate for collective bargaining purposes consisted of "All employees in its Poughkeepsie store, includ-ing employees in the leased departments, but excluding officers, store managers, guards, and supervisors as defined in the Act."

There is, however, persuasive evidence that the decision to raise holiday pay was not reached until after August 10. Moreover, there is no evidence that the decision, whenever it was reached, was announced to employees until some time after that date. The trial examiner found that the decision to increase holiday pay was made after August 10 and was prompted solely by the employees' adherence to the Union and in hope of allaying some of the discontent which led to that adherence. He accordingly found that the increase in holiday pay constituted an interference with employee rights in violation of § 8(a) (1) of the Act.

During the late summer and fall of 1965 several employees were interrogated as to their union sentiments. They were called by name over the store loudspeaker and asked to report to a Mrs. Edith Bernard in the president's office on the second floor. There they were questioned by Mrs. Bernard and on a few occasions by the company president as to their union attitudes, their experiences with union organizers and the circumstances under which they had signed union authorization cards. As a result of these interviews some 18 signed, written statements were obtained. Their general theme was that the Union organizers had exerted undue pressure on the employees to sign union cards and that those employees who had signed cards had done so because of such pressure and not because of any genuine interest in the Union. The trial examiner found that this interrogation constituted a violation of § 8(a) (1) of the Act.

In October Kathleen Roe, an employee, during working time openly solicited signatures to a petition repudiating the Union and later in December she, assisted by another employee, Julie Piccoli, circulated a similar petition. The trial examiner found that Roe and Piccoli were supervisors and that circulation of the petitions constituted another violation of § 8(a) (1) of the Act.

The Board affirmed the trial examiner's rulings and adopted his findings and conclusions except as to the size of the appropriate bargaining unit. The trial examiner had found that the appropriate unit was composed of 49 employees of whom 28 had signed valid union authorization cards before the crucial date of August 10, 1965. The Board found errors in this computation. It found that there were 50 employees in the unit of whom 30 had signed valid authorization cards before the critical date.

The question as to Papastrat is whether he was discharged for his activity on behalf of the Union or whether he was discharged because he was so overbearing and obnoxious in his union activities as to distress if not actually upset the emotions of other employees. We find substantial evidence in the record as a whole to support the conclusion of the trial examiner and the Board that it was the former. In addition to the evidence outlined above we think it significant that Papastrat, a new employee, was not warned to desist from overbearing conduct but was summarily discharged, and that the reason given to him for his discharge, his inexperience, is not the reason the respondent now advances as the real reason for the action. Moreover, even if the respondent had believed in good faith that Papastrat had been guilty of misconduct, which is doubtful on the record, it would still have violated § 8(a) (1) of the Act under the rule of NLRB v. Burnup & Sims, 379 U.S. 21, 23, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964).

It is clear that the Union asked for recognition as the bargaining agent of the respondent's employees on August 10, 1965. And it is clear that the respondent refused to bargain with the Union on that date without questioning either the validity of the cards or whether a majority of the employees in the unit favored the Union. It is undisputed that after August 10 the respondent ignored a telegram and a letter from the Union asking for an appointment to negotiate and then, as will presently appear, engaged in a course of conduct well calculated, as the Board found, to under-

mine the Union's majority. "The anti-union activity by the Company both reinforces the Board's conclusion that the Company refused to bargain and established that this refusal was in bad faith." Irving Air Chute Company v. NLRB, 350 F.2d 176, 182 (C.A. 2, 1965), quoted with approval in NLRB v. L. E. Farrell Company, 360 F.2d 205, 209 (C.A. 2, 1966).

█ The interrogation of the employees during the late summer and fall as to their union sentiments and attitudes consisted of far more than a single conversation between a supervisor and an old friend in the latter's home as in NLRB v. I. Posner, Inc., 342 F.2d 826, 828 (C.A. 2, 1965). Approximately 18 employees were called by name, one by one, over the store loud-speaker to report to the president's office where they were questioned by Edith Bernard and on some occasions by the president himself, and their statements were reduced to writing and signed in the presence of a witness. This technique of interrogation is coercive in itself. The interrogation does not nearly meet the standards of non-coercive interrogation laid down by this court in Bourne v. NLRB, 332 F.2d 47, 48 (C.A. 2, 1964).

█ We turn now to the respondent's contention that Edith Bernard, the principal interrogator of employees, and Kathleen Roe and Julie Piccoli, who circulated antiunion petitions, and others in their category of employment whom the Board excluded from the bargaining unit, were not supervisors as the Board found but only rank and file employees. These women were classified by the respondent as "senior employees" or "lead girls." They did not have any authority to hire, fire or discipline other employees or effectively to recommend such action. They did have authority, however, on their own initiative to transfer junior employees from one station in the store to another as the pressure of business might from time to time require. And in doing so they used their own independent judgment. This, the trial examiner and the Board found, was enough to make these women "supervisors" within the definition of § 2(11) of the Act even though junior employees could ask for, and ordinarily would be given, assistance at their stations whenever the need arose.

█ The definition of the term "supervisor" in § 2(11) of the Act is of necessity elastic. " * * * the gradations of authority 'responsibly to direct' the work of others from that of general manager or other top executive to 'straw boss' [footnote omitted] are so infinite and subtle that of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function to determine those who as a practical matter fall within the statutory definition of a 'supervisor.'" NLRB v. Swift and Company, 292 F.2d 561, 563 (C.A. 1, 1961). Each case must be decided on its own facts and the Board's determination stands if it has warrant in the record and a reasonable basis in the statute. It will suffice to say that we find such warrant and basis here.

█ The finding of the trial examiner and the Board that the respondent's decision to raise holiday pay was motivated and timed to discourage union adherence rests upon an evaluation of the credibility of witnesses. It is long settled law that the courts do not disturb such findings, and conferring economic benefits to discourage union adherence violates § 8(a) (1) of the Act. NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964).

We find no merit in the respondent's contention that the Union obtained some authorization cards under false pretenses, nor do we find any merit in its contention that the Board erred in including some employees in the unit and in excluding others.

█ We find the Board's order directing the respondent to bargain with the Union appropriate. The respondent did not express any doubt that the Union represented a majority of the employees in the unit, nor did it express any doubt as to the validity of the cards. And it

avoided answering the Union's request to bargain for almost three weeks during which time and thereafter it engaged in unfair labor practices, which would have made a free and fair election impossible. Under these circumstances an order to bargain is well within the Board's broad power to fashion an appropriate remedy.

Enforcement granted.