**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The PEMBECK OIL CORPORATION, Respondent.**

**No. 129, Docket 32120.**

United States Court of Appeals
Second Circuit.

Argued Oct. 30, 1968.

Decided Nov. 27, 1968.

Hays, Circuit Judge, dissented.

William J. Avrutis, Washington, D. C.
(Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, Elliot Moore, Washington, D. C., Attorney), for Petitioner.

William J. Larkin, II, Waterbury, Conn., for Respondent.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

KAUFMAN, Circuit Judge:

This case comes before us on petition of the National Labor Relations Board for enforcement of its order against The Pembeck Oil Corporation (hereinafter referred to as the Company).[1] The Trial Examiner found that the Company had violated § 8(a) (1), (3) and (5) of the National Labor Relations Act by 1) refusing to bargain with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 677 (hereinafter referred to as the Union), 2) bargaining directly with its employees, 3) causing them to repudiate the Union, and 4) discriminatorily discharging Collins, one of its employees, for union activity. Accordingly, he recommended that the Company be ordered to cease and desist from further violations of § 8(a) (1) and (5), to reimburse Collins for the loss of wages he suffered as a result of the discrimination[2] and to bargain with the Union. The Board adopted the Trial Examiner's findings and recommendations in their entirety. Since we believe, upon review of the record, that there is substantial

---

1. Pembeck is a Connecticut corporation engaged in commerce within the meaning of the Act, and the alleged unfair labor practices occurred in Meriden, Connecticut, its principal place of business, all within the jurisdiction of this court.

2. Since the Company had voluntarily offered to rehire Collins, there was no need for an order directing his reinstatement.

evidence to support these findings, we grant enforcement of the Board's order, except that, for reasons discussed below, we modify that portion of the order requiring the Company to bargain with the Union.

### I.

The Company is engaged in the business of selling fuel oil, and installing and servicing oil burners in homes and commercial establishments. In the operation of its business the Company employs servicemen who install, service, and repair industrial and domestic oil burners, truck drivers who deliver fuel oil to its customers, sootmen who clean oil burners and related equipment, and a maintenance man who works in the Company's warehouse keeping the shop clean and taking care of the stock.[3] At the time of the events in question, the Company employed 15 such workmen: eight servicemen, two drivers, four sootmen and one maintenance man. Two of the servicemen performed only domestic work, while the other six were engaged in both industrial and domestic work; additionally, two of these six also installed oil burners in buildings under construction, work which the Trial Examiner found occupied their time for only about six weeks out of a year. During the summer when few oil deliveries were made, the drivers were engaged primarily in assisting the servicemen, a task also performed on rare occasions by the sootmen. All these employees are hourly rated and carry timecards, and, except for the maintenance man, all wear the same uniform. In addition, all are covered by a Company insurance program, have the same vacation and sick leave privileges, and share the same shop facilities.

Prior to the events in question, no labor organization had represented all of the Company's employees. The two servicemen who install oil burners in buildings under construction were, however, covered by a collective bargaining contract between the Company and Local Union No. 21, United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry (hereinafter referred to as the Plumbers Union). This contract applied only when these two employees were actually performing the special work of installing oil burners in buildings under construction. When they were engaged in their usual tasks as servicemen, it was not operative except that it permitted them to participate in a health, welfare, and pension program provided for in the agreement.

The company supervisors are its president, Fred J. Knell, secretary John W. Grant, dispatcher Robert J. Thuotte, and sales engineer Arthur Moskaluk. Knell oversees the entire operation. Moskaluk assigns work to all servicemen, assists them with technical problems, and occasionally directs the work of the sootmen, drivers and maintenance man, although these employees are normally supervised by Thuotte and Grant.

The events giving rise to the unfair labor practices here in question began on August 18, 1966, when the Company hired Carl Collins as a fuel delivery driver. According to Collins' testimony before the Trial Examiner, at the time he was hired he was told about the Company's "job training," in reference to which Thuotte said that Collins would "go out with another man for a while to learn the job and that (the Company) invested approximately a year in a man before he would become efficient like they like their employees to be." During this interview Collins was wearing a union button, and he informed his interviewers that he had been a union member.

Shortly after August 19, when Collins commenced his employment, other employees expressed to him dissatisfaction with their working conditions, and, knowing that he was a union member, requested that he contact someone to whom they could talk about joining a union. Collins

---

**3.** In addition, the Company employs several office clerks, but they are not in any way affected by the events here in question.

called James Galullo, the Union's Business Agent, who sent authorization cards and literature to the employees and additional authorization cards to Collins. Collins distributed these cards among the employees and also discussed with them, individually and in groups, the benefits they might derive from representation by the Union.

By September 8, nine of the fifteen employees had signed authorization cards.[4] The following day, the Union sent a letter to the Company stating:

"Teamsters Local Union No. 677, hereby notifies you that a majority of your truck drivers, oil burner servicemen and installers, mechanics, and helpers have authorized our Union to act as their representative for the purpose of negotiating a labor contract covering their wages, rates of pay, hours of work, and other working conditions.

"I suggest that the first negotiating session be held during the week beginning Sunday, September 11, 1966, at a time which is convenient."

Knell received this letter the morning of September 12.[5] According to his testimony, he was taken by surprise and "overwhelmed" by its contents, and he immediately retained an attorney, who replied to the Union the following day, saying:

" * * * The Pembeck Oil Corporation disputes your claim that a majority of the truck drivers, oil burner servicemen and installers, mechanics, and helpers employed by that Company have authorized you to act as their bargaining representative.

"In addition, the Pembeck Oil Corporation disputes the appropriateness of the unit.

"The Pembeck Oil Corporation will recognize you only if you are certified as the bargaining agent as a result of an election conducted by the National Labor Relations Board. * * *

"It is the Company's opinion and position that any cards signed by any of its employees were cards signed solely for the purpose of obtaining a representation election conducted by the National Labor Relations Board and, if not for that purpose, were signed based upon misrepresentations by representatives of your Union as to the import of these cards."

On the same day that the Company received the Union's letter requesting recognition and bargaining, it discharged Collins. At the time, Grant explained to Collins as the reason for his discharge that he had made "too many mistakes in computing the price of fuel oil." And later that day Grant gave Collins a Connecticut Employment Security Division form in which, under the caption "Reason for Unemployment," he had specified "Inability to Figure or Compute Prices." Before the Trial Examiner, both Thuotte and Grant stated that they had made the decision to fire Collins jointly, after conferring together, but they gave somewhat different explanations for the discharge. Thus, Thuotte testified that their decision was based on Collins' errors in computing oil prices and his failure to deliver oil to a customer at the specified time, while Grant added to these reasons Collins' spillage of oil on a customer's cellar floor, delivery of oil to a customer who did not order any, and giving a customer an invoice intended for another.

On the following evening, about 10 of the Company's employees and Collins met with Galullo at the Union's headquarters, where they discussed Collins' discharge and the Company's refusal to recognize the Union. In addition, the employees submitted to Galullo a list of benefits which they expected the Union

4. These cards stated: "I hereby authorize the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America to represent me for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment. * * * "

5. On this day the Union filed a representation petition, which was later withdrawn without prejudice.

to obtain for them through negotiation with the Company. It was decided at this meeting that the employees should strike for the purpose of securing Collins' reinstatement and obtaining a collective bargaining contract.

Accordingly, the next day, September 14, most of the employees who had attended the meeting the previous evening struck and picketed the Company's premises. Early the following morning, however, the employees abandoned the strike, apparently because the two servicemen employed by the Company who were members of the Plumbers Union had not honored their picket line during the previous day. Then one of the employees, Carlson, acting for all the striking employees, telephoned Grant to ask whether they "could come in and sit down and talk." When Grant agreed, the employees went to the Company premises, where they met with Knell, Thuotte, and Grant.

Carlson initiated the discussion by saying that the employees were there to discuss their "gripes," to which Knell replied "that he had no idea things had gotten as bad as they were * * * that this was a good thing that it did come out * * * and that * * * we could straighten something out by having this get together." Among the subjects which the employees then mentioned were the lack of a pension plan, their desire for a posted pay scale, and their concern about sick and holiday pay. No specific proposals were presented by either side, and no agreement was reached, except that they would all meet again during the following week. The employees then withdrew to the Company's shop to prepare specific proposals to present at the next meeting.

Before the meeting had started, Knell had called the Company's attorney for advice as to what action the Company should take under the circumstances, but he had been unable to reach him. Counsel returned the call while the employees were conferring in the shop, and upon learning of the morning's events, he informed Knell that the Company was not permitted to meet further with the employees since they had signed authorization cards and accordingly were considered members of the Union. Grant and Knell promptly told the employees that, upon the advice of their attorney, they could not meet with them further, explaining that their attorney had informed them "you have signed cards, and you are automatically represented by the Union."

Later the same day, the employees decided that they no longer wished the Union to represent them. Subsequently they engaged an attorney of their own choice who under their instruction, sent formal notices informing the Union that the employees rescinded the authority they had previously given the Union to represent them.

## II.

Turning first to the alleged violation of § 8(a) (3), the Trial Examiner found, and the Board agreed, that the Company had been motivated by antiunion considerations in discharging Collins. The Company contends rather that it released Collins because of the many serious mistakes he made during the short term of his employment. Even if we view the facts most charitably toward Collins, we must agree that he had displayed no small ineptitude in the relatively short period he was on the job. From the Company's undisputed evidence, it appears that Collins made numerous blunders in computing the invoices for the oil he delivered, pumped oil on the cellar floor of one customer, spilled oil on the lawn of another, and failed to make an oil delivery at the scheduled time. Nevertheless, the rule is well established that although ample valid grounds may exist for the discharge of an employee, that discharge will violate § 8(a) (3) if it was in fact motivated, even partially, by the employee's union activity. N. L. R. B. v. Milco, Inc., 388 F.2d 133 (2d Cir. 1968); N. L. R. B. v. D'Armigene, Inc., 353 F.2d 406 (2d Cir. 1965); N. L. R. B. v. Great Eastern Color Lithographic Corp., 309 F.2d 352 (2d Cir. 1962), cert. denied, 373 U.S. 950, 83 S.Ct. 1680, 10

L.Ed.2d 705 (1963). Thus, where there are legitimate reasons for the discharge of an employee, the question is whether those were in fact the only grounds for the dismissal, or whether they were "put forth as a mere pretext to justify an impermissible discharge." N. L. R. B. v. Milco, Inc., supra, 388 F.2d at 138.

In this instance, the Trial Examiner relied on several factors in determining that the Company dismissed Collins not for his inadequate performance on the job, but because of his leadership in organizing the Company's employees. First, he noted that Collins was told at the time he was hired that the Company did not expect him to become proficient at his work for approximately a year, and the Examiner reasonably inferred from this that the nature of the job was such that the Company must have expected a new employee such as Collins to make mistakes. Second, he observed that although Collins' initial errors came to the Company's attention in the first week of his employment, no action was taken until two weeks later, at which time, and within hours after Knell received the Union's request for recognition, Collins was summarily discharged. And finally, the Trial Examiner found his conclusion that the reason for the discharge asserted by the Company was merely a pretext buttressed by the fact that Grant and Thuotte gave somewhat divergent, if not actually conflicting reasons for their joint action.

■ Although these factors do not lead inescapably to the conclusion reached by the Trial Examiner and the Board, they do offer it substantial support. See N. L. R. B. v. Great Eastern Color Lithographic Corp., supra; N. L. R. B. v. United Mineral & Chemical Corp., 391 F.2d 829 (2d Cir. 1968). The Company, nevertheless, argues that we should reverse the Board because there is no proof that it actually knew of Collins' union activities prior to his discharge. But although such knowledge is a necessary ingredient of a violation of § 8(a) (3), it need not be established by direct evidence; inferences may be drawn from the surrounding circumstances. In view of the evidence that, 1) the Company knew Collins had been a union member when it hired him, 2) there were only a small number of employees in the Company's plant and most of Collins' activity on behalf of the Union was conducted in the plant during working hours, N. L. R. B. v. Joseph Antell, Inc., 358 F.2d 880 (1st Cir. 1966) (the "Small Plant Doctrine"), and 3) Collins' discharge occurred abruptly within hours after the Company received the Union's request for recognition, we believe there was substantial evidence to justify the conclusion that the Company had knowledge of Collins' union activity. Accordingly, we affirm the finding that Collins' discharge was in violation of § 8(a) (3).

### III.

■ With respect to the other alleged unfair labor practices, the Trial Examiner found, and the Board agreed, that the Company had violated § 8(a) (5) by refusing to bargain with the Union and then by bargaining directly with the employees, and that it had violated § 8 (a) (1) by causing the employees to repudiate the Union. As to the first charge, the Company's response is that it was justified in refusing to bargain with the Union because it believed the bargaining unit which the Union claimed to represent (all 15 of the employees) was inappropriate and because it had a good faith doubt that the Union had been authorized by a majority of the employees to represent them. The Trial Examiner found, however, that in view of the similarity of conditions under which all the employees worked, and the overlapping of their functions and supervision, all the employees shared a large measure of community interest and hence constituted an appropriate unit for purposes of collective bargaining. United Aircraft Corp. (Hamilton Standard Division) v. N. L. R. B., 333 F.2d 819 (2d Cir. 1964), cert. denied 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 796 (1965). Moreover, the Trial Examiner reasoned that the coverage of the two servicemen in

the contract between the Company and the Plumbers Union did not preclude their inclusion in the bargaining unit, since they were dual-function employees, and the Plumbers Union contract was operative only for the short period during the year when they were doing the specialized work of installing oil burners in buildings under construction. Since we find this result well within the Board's discretion, we see no reason to upset the determination that the bargaining unit chosen by the Union was an appropriate one. N. L. R. B. v. Sunrise Lumber & Trim Corp., 241 F.2d 620 (2d Cir.), cert. denied 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34 (1957).

■ Furthermore, the law is settled that a sincere belief that a bargaining unit chosen by the union is improper does not constitute a defense to a violation of § 8(a) (5) where that unit is in fact an appropriate one. United Aircraft Corp. (Hamilton Standard Division) v. N. L. R. B., supra; Florence Printing Co. v. N. L. R. B., 333 F.2d 289 (4th Cir. 1964).

■ The Company contends, moreover, that the employees were induced to sign the Union authorization cards by misrepresentations as to their purpose and hence such cards should not be considered evidence of a Union majority. However, the Trial Examiner found, and his findings are supported by the evidence, that the cards unequivocally authorized the Union to represent those who signed for the purpose of collective bargaining, and that no misrepresentations were made by Collins or any other Union representative to the employees at the time they signed the cards.[6] The only evidence offered by the Company in support of its contention was the testimony of several employees that they were under the impression the cards were intended for a purpose other than authorizing the Union to represent them. We believe that the Trial Examiner was correct in concluding that where an authorization card is clear on its face, and union representatives have made no misrepresentations with respect to it, an employee's thoughts as to what he believed was the purpose to be served by the card cannot be used to discredit a majority the union has legitimately achieved. Joy Silk Mills, Inc. v. N. L. R. B., 87 U.S.App. D.C. 360, 185 F.2d 732, 743 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951). Furthermore, we believe the Trial Examiner's finding that the Company's discharge of Collins and commencement and abrupt termination of direct bargaining with the employees indicated the Company's bad faith in refusing to bargain is adequately supported by the evidence and should be affirmed. Additionally, since the Union was authorized by a majority of the employees in an appropriate bargaining unit to represent them, the Company's direct bargaining with the employees constituted an independent violation of § 8(a) (5). Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).

■ Finally, the Trial Examiner and Board found that by first meeting directly with the employees and instilling in them the expectation that it would improve their conditions of employment, and then withdrawing its offer for future negotiations because they had signed authorization cards, the Company had induced the employees to repudiate the Union in violation of § 8(a) (1). Although the evidence was not overwhelming that the Company's conduct was in fact the cause of the employees' decision to withdraw from the Union, the Board's inference was reasonable, and in view of its special qualifications to determine the effects of such actions on the minds of the employees, N. L. R. B. v. Stow Manufacturing Co., 217 F.2d 900 (2d

---

6. The Trial Examiner did find that Collins misrepresented to one of the employees that he was the only one who had not signed a card when in fact at the time only six of the fifteen had done so. For this reason, he discounted Emery's card in ascertaining the Union's majority status.

Cir. 1954), cert. denied 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751 (1955), we do not feel it appropriate to disturb their determination.

## IV.

■■ Having found that the Company's conduct described above did violate § 8(a) (1) and (5), we are left with the question whether the remedy ordered by the Board—direct bargaining with the Union—is appropriate in this case. It is well established that the Board may properly order an employer found to have committed unfair labor practices to bargain directly with a Union which lost its majority subsequent to the employer's wrongful refusal to bargain with it. Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944). Nevertheless, we are not unmindful of the potency of such a remedy. Since it dispenses with the necessity of an electtion, there is always the risk that a bargaining representative may be imposed on employees, at least for a time, when they no longer wish it to represent them. N. L. R. B. v. Flomatic Corp., 347 F.2d 74 (2d Cir. 1965); N. L. R. B. v. Better Val-U Stores of Mansfield, Inc., 401 F.2d 491 (2d Cir. decided September 10, 1968).

■■ A bargaining order is clearly appropriate "where the employer's conduct has been so flagrantly hostile to the organizing efforts of a union" that any future election would be tainted by his past transgressions. N. L. R. B. v. Flomatic Corp., supra, 347 F.2d at 78. But here there has been no such display of flagrant hostility as would suggest that a future election would not actually reflect the desires of the employees. The conduct of the Company to which the Board attributes the employees' defection from the Union was hardly vituperative; indeed it seems more the result of inadvertence than anything else. We recall that it was the employees who initiated the direct bargaining, and that Knell had attempted unsuccessfully to get legal advice before he began conferring with

them but his Counsel was not available. When his lawyer returned his call and advised Knell that he could not confer with the employees, he promptly terminated the talks. Of course, these circumstances provide no defense to the unfair labor practice charges, but they do suggest that the climate generated by the Company's actions was not one of hostility and coercion. Moreover, we would be especially hesitant to assume in this case that the employees now desire to be represented by the Union in view of the fact that only a slim majority of the employees ever signed the authorization cards,[7] and that the employees had in all but a fleeting association with the Union.

We note the dissenting opinion stresses that the appropriateness of a bargaining order should stand or fall simply on which section of the Act has been violated without regard to or examination of the facts which constituted the violation. Thus, it argues that the fact that in this case, unlike *Flomatic* and *Better Val-U Stores*, the employer was found to have violated § 8(a) (5) should cause us to enforce the order by rote. We suggest, however, that the finding of an unlawful refusal to bargain does not *ipso facto* and in all cases lead to the conclusion that an order to bargain must always be the only remedy for the violation. And, we do not take action here, as the dissenting opinion suggests, which is inconsistent with those cases subsequent to *Flomatic* in which we held a bargaining order to be an appropriate remedy for an § 8(a) (5) violation based upon a card majority. In each of those cases, the conduct on which the unfair labor practice findings were predicated was found to be clearly hostile to the union, and without question to have contaminated the results of any future election. Indeed, Judge Hays speaking for the majority in Bryant Chucking Grinder Co. v. N. L. R. B., 389 F.2d 565, 568 (2d Cir. 1967) made it clear that the bargaining order was appropriate (in § 8(a) (1)

---

**7.** The Trial Examiner found that the Union represented eight of the employees

on September 9, when it first requested recognition.

cases) because "the employer deliberately destroyed the union's majority." And, in examining those cases in which the possible applicability of *Flomatic* was considered and then rejected, we observe that in N. L. R. B. v. Consolidated Rendering Co., 386 F.2d 699 (2d Cir. 1967), the employer was found to have violated § 8(a) (1) by threats of reprisals, promises of benefits and coercive interrogation of its employees, all of which were for the purpose of causing the Union's majority to be dissipated and had the effect of making a free election impossible; and in N. L. R. B. v. Gotham Shoe Mfg. Co., 359 F.2d 684 (2d Cir. 1966), the employer similarly engaged in a course of conduct, including threats and promises, the purpose of which was to destroy the Union's majority; also in Irving Air Chute Co. v. N. L. R. B., 350 F.2d 176 (2d Cir. 1965), the employer in addition to violating § 8(a) (1) and (2) by threatening its employees and attempting to form a company dominated bargaining committee, had clearly demonstrated the bad faith of its refusal to bargain by refusing even to examine the authorization cards evidencing the union's majority. Thus, contrary to our dissenting brother's view, those cases are in no way undercut by our holding on the particular facts before us, where the employer's unfair labor practices have been as minimal as we have indicated and its conduct does not preclude a fair election in the future, and particularly where there is a considerable doubt as to the employees' continued desire to be represented by the Union.

Accordingly, we believe that the Board should have permitted the bargaining representative to be determined by an election held within a reasonable time. A bargaining order in this case would be excessively strong medicine for the ailment and unfair not only to the employer but to the employees as well.

The Board's order will be enforced in all respects except that the direction to bargain is modified as set forth above.

HAYS, Circuit Judge (dissenting):

This case illustrates the particularly pernicious effect of a case which erroneously decided in the first place, is gradually broadened to cover other situations never contemplated by the first decision.

In NLRB v. Flomatic Corporation, 347 F.2d 74 (2d Cir. 1965), this court decided that the Board could not, under the circumstances there presented, employ a bargaining order to correct a situation in which it had found a Section 8(a) (1) violation. The relevant circumstance on which the court principally relied was that the Section 8(a) (1) violation was not "flagrant."

> "There was no aggressive or planned campaign aimed at dissipating union strength by resort to threats, discharges or refusals of recognition. On the contrary, the Board found that the employer was never asked to bargain, and there was evidence that he even expressed a willingness to do so if the employees wanted union representation." 347 F.2d at 78.

The court went on to say:

> "[T]he courts have implicitly recognized that the bargaining order remedy should be applied with restraint, and accordingly have enforced such orders in cases of §§ 8(a) (2), 8(a) (3) and 8(a) (5) violations, some of which were coupled with or included § 8(a) (1) transgressions. [Citing cases.] Those cases involved more glaring violations than the one found here, and where as in § 8(a) (5), an employer has refused to bargain, under circumstances in which he was under a duty to do so because the union enjoyed the status of exclusive bargaining agent, the remedy may be thought uniquely appropriate. No court, however, has held that a borderline, unaggravated § 8(a) (1) violation, standing alone, occurring prior to an election, warranted a bargaining order." 347 F.2d at 79.

Thus it is perfectly clear that *Flomatic,* as it was originally decided, stood

solely for the narrow proposition that where there was only a non-flagrant Section 8(a) (1) violation, the Board could not order the employer to bargain.

*Flomatic* was first extended beyond its original limits in NLRB v. Better Val-U Stores, of Mansfield, Inc., 401 F.2d 491 (2d Cir. 1968). In that case there was not only a violation of Section 8(a) (1) but also a violation of Section 8(a) (3) by the discharge of an employee. In spite of the express language of *Flomatic* as to "discharges" and "Section 8(a) (3)" violations, quoted above, the court said "[W]e feel compelled by the facts in our case to follow the majority view in *Flomatic*."

However, in *Better Val-U* the court said:

"To require an employer to reinstate an employee with back pay, to cease and desist from further unfair labor practices, and to post appropriate notices are proper and accepted remedies for violations of Sections 8(a) (1) and 8(a) (3). See, e. g., NLRB v. A. P. W. Products Co., 316 F.2d 899 (2 Cir. 1963); NLRB v. Firedoor Corp. of America, 291 F.2d 328 (2 Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 242, 7 L.Ed.2d 136 (1961). Accordingly, to this extent we grant enforcement of the Board's order without further comment. However, the Board's imposition of a bargaining order where no violation of Section 8(a) (5) was found to have occurred is a more troublesome matter. * * *

The controlling test in this circuit as to whether a bargaining order is appropriate in a situation where there was no finding of a refusal to bargain by the employer in violation of § 8(a) (5) of the Act was announced by Judge Anderson in NLRB v. Flomatic Corp., 347 F.2d 74 (2 Cir. 1965)." 401 F.2d p. 493.

Thus there can be no doubt that, although the *Flomatic* rule was extended by *Better Val-U* to cover a Section 8(a) (3) violation, there was no intention to extend that case to cover a situation where the Board had found a Section 8 (a) (5) violation and was upheld by the court in such a finding. In fact in such a case, the court said in *Flomatic*, a bargaining order "may be thought uniquely appropriate."

During the period since *Flomatic* this court has on several occasions enforced the Board's bargaining orders on the basis of a finding of Section 8(a) (5) violations based on a card count. See NLRB v. Big Ben Department Stores, Inc., 396 F.2d 78 (2d Cir. 1968); Bryant Chucking Grinder Co. v. NLRB, 389 F.2d 565 (2d Cir. 1967); NLRB v. Consolidated Rendering Co., 386 F.2d 699 (2d Cir. 1967); NLRB v. Divigard Baking Co., 367 F.2d 389 (2d Cir. 1966); NLRB v. Gotham Shoe Mfg. Co., 359 F. 2d 684 (2d Cir. 1966); Irving Air Chute Co. v. NLRB, 350 F.2d 176 (2d Cir. 1965).

The majority, overruling *sub silentio* all the intervening cases, now pushes *Flomatic* an enormous distance farther than it has previously been extended and condemns a bargaining order in a case where there was a violation of the duty to bargain under Section 8(a) (5) and where the court has upheld the Board in its finding of such a violation.

It is obvious that the result reached here is not only not required by *Flomatic* and *Better Val-U* but that it is directly at variance with the reasoning of those cases. Moreover it is contrary to numerous previous decisions of this court and contrary to the holding of the Supreme Court in such cases as Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944).