**WHEELER–VAN LABEL COMPANY,**
**Subsidiary of Stecher-Traung-Schmidt**
**Corporation, Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**Nos. 344, 345, Dockets 32707, 32855.**

United States Court of Appeals
Second Circuit.

Argued Feb. 12, 1969.

Decided March 19, 1969.

*& Co., supra,* that Rule 4(d) (7) is such an authorization.

A. Terry Van Houten, Rochester, N. Y. (Harris, Beach, Wilcox, Dale & Linowitz, Rochester, N. Y., on the brief), for petitioner.

Herman M. Levy, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, on the brief), for respondent.

Before ANDERSON and FEINBERG, Circuit Judges, and MANSFIELD, District Judge.*

FEINBERG, Circuit Judge:

From an order of the National Labor Relations Board, 172 N.L.R.B. No. 186 (1968), finding that Wheeler-Van Label Company, subsidiary of Stecher-Traung-Schmidt Corporation ("the Company"), had refused to bargain with a union representing its composing area employees, both parties seek judicial review.[1] For reasons set forth below, we deny the Company's petition and enforce the Board's order.

The Company is in the commercial printing business in Grand Rapids, Michigan. In March 1967, the Board conducted a representation election, with three unions on the ballot, in two units of the Company's employees. Group (1) was composed of all journeymen pressmen, apprentice pressmen, assistants, and helpers in the pressroom and rotogravure department, but excluded composing area employees. In group (2) were the remaining production and maintenance employees with various exclusions not now relevant. The composing area employees voted in group (2). As a result of the election the Board certified Grand Rapids Printing Pressmen and Assistants' Union, Local No. 13, International Printing Pressmen and Assistants' Union of North America, AFL–CIO, as the bargaining representative of the employees in voting group (1);[2] the Board also certified that no labor organization had been selected as bargaining representative of the employees in voting group (2).

A few months later, the Company's five composing area employees signed authorization cards designating as their bargaining representative a fourth union, Grand Rapids Typographical Union, Local 39, International Typographical Union, AFL–CIO ("the Union"). Shortly thereafter, four of the composing area employees let it be known to various Company supervisors that they had signed authorization cards. By letter dated August 4, 1967, the Union advised the Company that it represented a majority of composing area employees and requested the Company to bargain with it. In reply, the Company declined to negotiate for the stated reason that:

> The best and most reliable method of knowing how a majority of the men in the Composing Room feel about Union representation is a Board-Conducted secret ballot election.
>
> This group of employees participated in such an election in March of 1967 and it is our understanding that a year from that date should go by before another is scheduled.

The Union renewed its demand for recognition and bargaining and offered to submit authorization cards to an impartial third party acceptable to both. The Company again refused to recognize or bargain with the Union. Early in September 1967, the Union filed an unfair labor practice charge against the Company. While this was pending, and in the same month, four of the five composing area employees tried to arrange a meeting with the Company president. Unsuccessful in this, they met with plant

---

* Of the Southern District of New York, sitting by designation.

1. The Company petitioned us to review and set aside the Board's order; the Board, by cross application, seeks enforcement.

2. The other unions on the ballot were International Brotherhood of Pulp, Sulphite and Paper Mill Workers, AFL–CIO, and Local Union No. 216, International Brotherhood of Bookbinders, AFL–CIO.

manager Bernard Kochanowski and told him that speaking for themselves and for the absent employee they wanted the Union to represent them; Kochanowski replied that he would inform the "proper authorities."

No meeting between the Company and the Union occurred, and in December 1967 the Regional Director issued a complaint against the Company charging it with having violated sections 8(a) (1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1), (5). In January 1968, a hearing was held, culminating in a trial examiner's decision in June 1968, adopted by the Board in August, which found that the Company had violated sections 8(a) (1) and (5) and ordered the Company to bargain with the Union. In seeking to set aside the Board's order, the Company argues in this court that the composing area employees did not comprise an appropriate bargaining unit and that the Board's finding of refusal to bargain was improper.

Turning to the unit question first, we are told that composing room work has traditionally consisted of setting of type either by hand or in "hot metal" and assembling the type in forms. However, the Company has virtually eliminated the type-setting phase of the work. Only one of the five employees in question does such work; for the most part, the Company uses pre-set plates obtained from outside sources. Thus, these employees are engaged mainly in assembling the plates onto a form or base for use in the printing operation. According to the hearing testimony: this work requires a distinct skill, which takes from "over a year" to five years to attain; the composing area employees work in a specific location as a separate composing department within the Company structure, are supervised by a sep-

arate foreman, and do not transfer to or from other departments;[3] and the Union has approximately 2,000 collective bargaining agreements with other employers, the bulk of which cover solely composing room employees.

■ In light of these facts, the Company undertakes a sizeable burden in arguing that the unit found was not an appropriate one; there can be no dispute that the Board has considerable leeway in exercising its judgment under section 9(b) of the Act, 29 U.S.C. § 159(b), as to the appropriateness of a given unit. A unit finding by the Board "involves of necessity a large measure of informed discretion," Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947), and, where it is supported by substantial evidence, will not be reversed "in the absence of an 'arbitrary or capricious exercise of administrative discretion,'" Empire State Sugar Co. v. NLRB, 401 F.2d 559, 562 (2d Cir. 1968). The Company argues that the Board's decision was, in fact, arbitrary and capricious, principally because the cases the Board relied on all involved employees who set type or did equivalent work,[4] a function not performed by four of the Company's five composing area employees. The Company claims that by ignoring this factor the Board arbitrarily disregarded the substance of its prior decisions. As further evidence of inconsistency the Company points to the March 1967 election, when the Board placed these five employees in the group (2) voting unit, which included other production and maintenance employees. Finally, the Company argues that its composing area employees should not be separated as a unit from the pressroom employees, with whom they are in close contact and have much in common.

3. The testimony was undisputed that no one had transferred out of the composing department since 1947 and that for at least 12 years all new composing area employees had been recruited from outside the Company.

4. The trial examiner cited Frye & Smith, Ltd., 151 N.L.R.B. 49 (1965); Leslie F. Clarke & Co., 147 N.L.R.B. 1240 (1964); Meredith Publishing Co., 140 N.L.R.B. 509 (1963); Worzella Publishing Co., 121 N.L.R.B. 78 (1958).

We think that the Board's unit determination must be upheld. Whether these five employees perform all the work traditionally associated with composing rooms is not controlling. The key question is whether the composing area employees have a sufficient community of interest to be an appropriate unit. See United Aircraft Corp. v. NLRB, 333 F.2d 819, 822 (2d Cir. 1964), cert. denied, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 796 (1965). As to that, the evidence supporting the Board's affirmative finding is persuasive, and the cases it relied on do not suggest a contrary view. Indeed, the facts here seem at least as strong as those found sufficient in Empire State Sugar Co. v. NLRB, *supra*. The alleged inconsistency with the Board's determination for the March 1967 election is not imposing. The question before us is not whether the composing area unit is the *only* appropriate unit for these employees. The Board's duty is to choose *an* appropriate unit, and it may select among several appropriate ones. See, e. g., NLRB v. Western & Southern Life Ins. Co., 391 F.2d 119, 122 (3d Cir.), cert. denied, 393 U.S. 978, 89 S.Ct. 445, 21 L.Ed.2d 439 (1968); NLRB v. Local 19, Int'l Bhd of Longshoremen, 286 F.2d 661, 664 (7th Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). On the record before us, the Board's unit determination cannot in any sense accurately be called arbitrary or capricious.

The Company's second point is that the Board was not justified in finding that the Company refused to bargain. Under the present state of the law and on this record, the argument is not persuasive. At no time did the Company express any doubt—much less a good faith one—as to the Union's majority status. Its August 9, 1967 letter stated only its preference for an election and its subsequent letter ignored the Union's suggestion that an impartial third party check the authorization cards. Cf. Irving Air Chute Co. v. NLRB, 350 F.2d 176, 182 (2d Cir. 1965); Bryant Chucking Grinder Co. v. NLRB, 389 F.2d 565, 568 (2d Cir. 1967), cert. denied, 392 U.S. 908, 88 S.Ct. 2055, 20 L.Ed.2d 1366 (1968). In addition, there was abundant evidence that the Company had actual knowledge of the Union's majority status. Before the Union's first written demand for recognition, conversations between four of the five composing area employees and supervisors indicated that status; it was made crystal-clear, after the Union's demand, at the meeting of September 29 with Kochanowski. In support of its "good faith," the Company now appears to contend that it originally regarded the unit sought as inappropriate. The hearing examiner pointed out that the Company never objected to the unit until after the General Counsel served a complaint. We agree that this weakens the Company's claim as to its state of mind four months earlier. In any event, we have held that sincere belief that a claimed unit is inappropriate is not controlling; indeed, we have characterized it as "of no consequence." [5] Finally, the Company did not question the individual validity of the Union's authorization cards; in fact, it does not do so now. Upon the entire record, the General Counsel here more than met his burden of proving the absence of good faith doubt. Compare NLRB v. Consolidated Rendering Co., 386 F.2d 699, 704 (2d Cir. 1967), with NLRB v. United Mineral & Chemical Corp., 391 F.2d 829, 837–838 (2d Cir. 1968).

The Company's chief argument on this aspect of the case is that the Board's order placed it "inextricably on the horns of a dilemma." The alleged dilemma arises from section 9(c) (3) of

---

5. United Aircraft Corp. v. NLRB, 333 F. 2d 819, 822 (2d Cir. 1964), cert. denied, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 796 (1965); see NLRB v. Pembeck Oil Corp., 404 F.2d 105, 111 (2d Cir. 1968); cf. NLRB v. M & M Oldsmobile, Inc.,

377 F.2d 712, 716–717 (2d Cir. 1967). But cf. NLRB v. World Carpets of New York, Inc., 403 F.2d 408, 411 n. 3 (2d Cir. 1968). See also NLRB v. Bardahl Oil Co., 399 F.2d 365, 368–370 (8th Cir. 1968).

the Act, 29 U.S.C. § 159(c) (3), which prohibits more than one representation election in any bargaining unit, or subdivision thereof, in a twelve-month period.[6] Therefore, the Company argues that when it received the Union's written demand in August 1967, the Company could not petition for an election to evidence its good faith doubt because one had been held five months before. While this is so, it is not clear to us what the dilemma was. The Company's preference for an election, it is true, would have been expressed more concretely had it petitioned for one, but its inability to do so did not prevent it from making that preference clear; in fact, it did so in its letters to the Union. Moreover, had there been no prior election, the Company would still have had no absolute right to one in the absence of a good faith doubt of the Union's majority status. It may be that this is the dilemma to which the Company points, since it cites NLRB v. S. S. Logan Packing Co., 386 F.2d 562 (4th Cir. 1967), which held that cards should not be the basis of a bargaining order. However, we are committed to a contrary view. See, e. g., NLRB v. World Carpets of New York, Inc., 403 F.2d 408, 412 (2d Cir. 1968); NLRB v. Niskayuna Consumers Cooperative, 376 F.2d 260 (2d Cir. 1966).[7] The controlling issue is not whether the Company could have sought an election, but whether it had a good faith doubt of the Union's majority status. That issue—one of fact —has been decided adversely to it by the Board, and that determination is supported by substantial evidence on the rec-

ord considered as a whole. Cf. Borden Cabinet Corp. v. NLRB, 375 F.2d 891 (7th Cir.), cert. denied, 389 U.S. 841, 88 S.Ct. 77, 19 L.Ed.2d 106 (1967).

In addition, although neither party has referred to it, we take note of the recent decision of this court in NLRB v. Pembeck Oil Corp., 404 F.2d 105 (2d Cir. 1968) (2–1), refusing to enforce a bargaining order even though there had been a section 8(a) (5) violation. The majority there distinguished various card-majority decisions where this court has enforced bargaining orders as cases where the employer's conduct "contaminated the results of any future election." 404 F.2d at 112. This distinction tends to support the argument made by the Company here that a violation of section 8(a) (5) sufficient to sustain a bargaining order in a card-majority case must be accompanied by independent unlawful acts that constitute an effort "to undermine a union's majority status" or otherwise "taint the laboratory conditions in which a Board conducted election could be held." However, we believe that the inappropriateness of the bargaining order in *Pembeck* depended upon the specific facts of that case, particularly the slimness of the union majority and "a considerable doubt as to the employees' continued desire" to be represented by the union. *Id.* at 113. Neither of those factors is present in this case. Indeed, the record here indicates that the employees were both unanimous and steadfast in their desire to be represented by the Union.

Finally, we note here also the opinion of another panel of this court, handed

---

6. In pertinent part section 9(c) (3) provides:

    No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held.

7. We are aware that the use of cards to support a duty to bargain will be presented to the Supreme Court in NLRB v. Gissel Packing Co., 398 F.2d 336 (4th Cir.) (per curiam), cert. granted, 393 U.S. 997, 89 S.Ct. 482, 21 L.Ed.2d 462

(1968), and NLRB v. Sinclair Co., 397 F.2d 157 (1st Cir.), cert. granted, 393 U. S. 997, 89 S.Ct. 482, 21 L.Ed.2d 462 (1968), and that the issue appears to be under reconsideration by the Board itself, as the Company suggests, citing Wilder Mfg. Co., 173 N.L.R.B. No. 30 (1968), and Grafton Boat Co., 173 N.L. R.B. No. 150 (1968). However, the question before us is whether the order of the Board here is enforceable as falling within its discretion on the present state of the law.

down after this case was argued, in Schwarzenbach-Huber Co. v. NLRB, 408 F.2d 236 (2d Cir. 1969). Since that case held that the Board incorrectly relied on a number of invalid cards and thus that the union did not represent a majority when it demanded recognition, it is not determinative here, where the Union's majority is clear.

Accordingly, the Company's petition is denied and the Board's cross application for enforcement is granted.